**23-4082**

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

### *for the*

## 𝔉𝔬𝔲𝔯𝔱𝔥 𝔠𝔦𝔯𝔠𝔲𝔦𝔱

UNITED STATES OF AMERICA,

*Plaintiff–Appellee,*

– v. –

JAMES GORDON MEEK,

*Defendant–Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

# APPENDIX

EUGENE V. GOROKHOV
BURNHAM & GOROKHOV PLLC
1424 K Street, NW, Suite 500
Washington, DC 20005
(202) 386-6920

*Counsel for Appellant*

CP COUNSEL PRESS • VA – (804) 648-3664

# TABLE OF CONTENTS

District Court Docket Sheet ..................................................................JA1

Defendant's Memorandum of Law Addressing Legal Standards
Applicable to Pretrial Detention Determination
     filed February 1, 2023..............................................................JA6

Government's Notice of Appeal
     filed February 1, 2023............................................................JA10

Order Setting Conditions of Release of
Magistrate Judge Lindsey R. Vaala
     filed February 1, 2023............................................................JA11

Government's Motion for Revocation of Release Order,
With Exhibit,
     filed February 4, 2023............................................................JA16

     Exhibit:

     1.     Affidavit in Support of a Criminal Complaint and Arrest Warrant
          dated January 31, 2023 .......................................JA22

Defendant's Opposition to the Government's Motion for Detention,
With Exhibits,
     filed February 4, 2023............................................................JA37

     Exhibits:

     1.     Letter from Raymond Gannon to the Court
          undated ...............................................................JA44

     2.     Letter from Doug Kimme to Judge Alston
          dated February 4, 2023 .......................................JA46

     3.     Letter from Dave and Vicki Sharrett to the Court
          dated February 1, 2023 .......................................JA47

Exhibits, continued:

4.    Letter from Rev. Kathleen Day to the Court
          dated February 1, 2023 ........................................................ JA50

5.    Letter from Marion Bowman to the Court
          undated ................................................................................. JA51

Transcript of Motion Hearing before
The Honorable Rossie D. Alston, Jr.
      on February 6, 2023 ................................................................. JA53

      Testimony of Tonya Griffith:

      Direct Examination by Ms. Bedell ........................................... JA57
      Cross Examination by Mr. Gorokhov ...................................... JA62
      Recross Examination by Ms. Bedell ........................................ JA64

Order of
The Honorable Rossie D. Alston, Jr.
Re:  Granting Government's Motion for Revocation of Release Order
      filed February 6, 2023 ............................................................ JA98

ii

APPEAL

# U.S. District Court
## Eastern District of Virginia - (Alexandria)
## CRIMINAL DOCKET FOR CASE #: 1:23-mj-00032-LRV-RDA All Defendants

Case title: USA v. Meek                         Date Filed: 01/31/2023

Assigned to: Magistrate Judge Lindsey R.
Vaala
Referred to: District Judge Rossie D.
Alston, Jr

Appeals court case number: 23-4082 4th
Circuit

**Defendant (1)**

**James Gordon Meek**                 represented by   **Eugene Victor Gorokhov**
                                                       Burnham & Gorokhov PLLC
                                                       1424 K St NW
                                                       Suite 500
                                                       Washington, DC 20005
                                                       202-386-6920
                                                       Email: eugene@evgpllc.com
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*
                                                       *Designation: Retained*

**Pending Counts**                                     **Disposition**

None

**Highest Offense Level (Opening)**

None

**Terminated Counts**                                  **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                                         **Disposition**

18:2252(a)(1)
Transportation of Child Pornography

JA1

**Plaintiff**

**USA**                          represented by **Alexandra Zoe Bedell**
                                                DOJ-USAO
                                                2100 Jamieson Ave
                                                Alexandria, VA 22314
                                                703-299-3773
                                                Email: zoe.bedell@usdoj.gov
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*
                                                *Designation: US Attorney*

                                                **Whitney Kramer**
                                                US Attorney's Office (Alexandria)
                                                2100 Jamieson Avenue
                                                Alexandria, VA 22314
                                                NA
                                                703-299-3700
                                                Email: whitney.kramer2@usdoj.gov
                                                *ATTORNEY TO BE NOTICED*
                                                *Designation: Retained*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 01/31/2023 | 1 | COMPLAINT as to James Gordon Meek (1). (Dest) (Entered: 01/31/2023) |
| 01/31/2023 | 2 | AFFIDAVIT by USA as to James Gordon Meek in re 1 Complaint. (Dest) (Entered: 01/31/2023) |
| 01/31/2023 | 4 | Redacted Criminal Case Cover Sheet. (Dest) (Entered: 01/31/2023) |
| 01/31/2023 | 5 | MOTION to Seal by USA as to James Gordon Meek. (Dest) (Entered: 01/31/2023) |
| 01/31/2023 | 6 | ORDER granting 5 Motion to Seal **until the defendant is arrested** as to James Gordon Meek (1). Signed by Magistrate Judge Lindsey R. Vaala on 1/31/2023. (Dest) (Entered: 01/31/2023) |
| 01/31/2023 | 7 | Arrest Warrant Issued by Magistrate Judge Lindsey R. Vaala in case as to James Gordon Meek. (Dest) (Entered: 01/31/2023) |
| 02/01/2023 |   | Case unsealed as to James Gordon Meek (jlan) (Entered: 02/01/2023) |
| 02/01/2023 | 8 | Memorandum by James Gordon Meek *regarding legal standards applicable to pretrial detention determination* (Gorokhov, Eugene) (Entered: 02/01/2023) |
| 02/01/2023 | 9 | NOTICE OF ATTORNEY APPEARANCE Whitney Kramer appearing for USA. (Kramer, Whitney) (Entered: 02/01/2023) |
| 02/01/2023 | 10 | Pretrial Services Bond REPORT (Initial Pretrial Services Bond Report) (SEALED - government and defense counsel) as to James Gordon Meek. (Jankovitz, Nicole) (Entered: 02/01/2023) |

JA2

| 02/01/2023 | 11 | Arrest Warrant Returned Executed on 1/31/2023 in case as to James Gordon Meek. (nneb) (Entered: 02/01/2023) |
|---|---|---|
| 02/01/2023 | 12 | NOTICE OF ATTORNEY APPEARANCE: Eugene Victor Gorokhov appearing for James Gordon Meek (nneb) (Entered: 02/01/2023) |
| 02/01/2023 | 13 | Minute Entry for proceedings held before Magistrate Judge Lindsey R. Vaala: Initial Appearance as to James Gordon Meek held on 2/1/2023. US appeared through Zoe Bedell and Whitney Kramer. Defendant appeared with counsel: Eugene Gorokhov. Deft informed of rights, charges and penalties. Counsel for the parties and the defendant were orally advised of the disclosure obligations set forth in Brady v. Maryland, 373 U.S. 83 (1963) and its progeny. Preliminary Hearing as to James Gordon Meek held on 2/1/2023. Gov't adduced evidence and rest. Affidavit entered into evidence as gov't exhibit 1. Court finds PC. Matter continued for further proceeding before the Grand Jury. Detention Hearing as to James Gordon Meek held on 2/1/2023. Gov't seeking detention and argues for detention. (deft exhibits 1,2,3,4,5 and 6 admitted)- Granted. Deft remanded to custody of USMS until all conditions are met. Gov't motion to stay release pending appeal before the District Judge- Granted. (Tape #FTR.)(nneb) (Entered: 02/01/2023) |
| 02/01/2023 | 14 | ORDER -This matter comes before the Court on its own initiative. Pursuant to Federal Rule of Criminal Procedure 5(f) and the Due Process Protections Act, the Court ORDERS the United States to adhere to the disclosure obligations set forth in Brady v. Maryland, 373 U.S. 83 (1963) and its progeny. Brady v. Maryland instructs that "the suppression by the prosecution of evidence favorable to an accused" violates due process where the evidence is "material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Failure to adhere to this requirement may result in serious consequences, up to and including exclusion of evidence, adverse jury instructions, dismissal of charges, contempt proceedings, disciplinary action, or sanctions by the court. Having given counsel the oral admonition required by the Due Process Protections Act, this Order serves as the reminder of prosecutorial obligation and duties in accordance with Rule 5(f) and the Eastern District of Virginia Standing Order concerning the same as to James Gordon Meek. Signed by Magistrate Judge Lindsey R. Vaala on 2/1/2023. (nneb) (Entered: 02/01/2023) |
| 02/01/2023 | 15 | APPEAL OF MAGISTRATE JUDGE DECISION to District Court in re 16 Order Setting Conditions of Release by USA as to James Gordon Meek (Bedell, Alexandra) Modified text on 2/1/2023 (jlan) (Entered: 02/01/2023) |
| 02/01/2023 | 16 | ORDER Setting Conditions of Release as to James Gordon Meek (1) PR BOND. Signed by Magistrate Judge Lindsey R. Vaala on 02/01/2023. (wgar, ) (Entered: 02/01/2023) |
| 02/01/2023 | | Case as to James Gordon Meek Assigned to District Judge Rossie D. Alston, Jr. (jlan) (Entered: 02/01/2023) |
| 02/02/2023 | 17 | ORDERED that the Order Setting Conditions of Release (Dkt. No. 16) is stayed pending the Government's appeal to a United States District Judge (see Order for further details). Signed by Magistrate Judge Lindsey R. Vaala on 2/2/2023. (nneb) (Entered: 02/02/2023) |

JA3

| 02/02/2023 | 18 | Emergency MOTION to Vacate *stay of detention order* by James Gordon Meek. (Attachments: # 1 Proposed Order)(Gorokhov, Eugene) (Entered: 02/02/2023) |
| 02/02/2023 | 19 | Sealed Motion to Seal by James Gordon Meek. (Attachments: # 1 Proposed Order) (Dest) (Entered: 02/02/2023) |
| 02/02/2023 | 20 | Under Seal Emergency Motion by James Gordon Meek. (Attachments: # 1 Proposed Order) (Dest) (Entered: 02/02/2023) |
| 02/02/2023 | | Set/Reset Hearings as to James Gordon Meek: Hearing on Appeal of Magistrate Judge's Order set for 2/6/2023 at 12:00 PM in Alexandria Courtroom 1000 before District Judge Rossie D. Alston Jr. (tarm) (Entered: 02/02/2023) |
| 02/02/2023 | 21 | ORDERED that the Government shall file, by 10:00 AM EST on February 3, 2023, a brief in response to Defendant's Motion to Vacate. Signed by Magistrate Judge Lindsey R. Vaala on 2/2/2023. (nneb) (Entered: 02/02/2023) |
| 02/02/2023 | 22 | ORDER granting 19 Sealed Motion as to James Gordon Meek (1). Signed by Magistrate Judge Lindsey R. Vaala on 02/02/23. (pmil, ) (Entered: 02/02/2023) |
| 02/03/2023 | 23 | RESPONSE in Opposition by USA as to James Gordon Meek re 18 Emergency MOTION to Vacate *stay of detention order* (Bedell, Alexandra) (Entered: 02/03/2023) |
| 02/03/2023 | 24 | ORDER denying as moot 20 Sealed Motion as to James Gordon Meek (see Order for details). Signed by Magistrate Judge Lindsey R. Vaala on 2/3/2023. (nneb) (Entered: 02/03/2023) |
| 02/03/2023 | 25 | ORDER denying 18 Emergency MOTION to Vacate stay of detention order (see Order for details). Signed by Magistrate Judge Lindsey R. Vaala on 2/3/2022. (nneb) (Entered: 02/03/2023) |
| 02/04/2023 | 26 | MOTION to Revoke *Release Order* by USA as to James Gordon Meek. (Attachments: # 1 Exhibit Complaint Affidavit)(Bedell, Alexandra) (Entered: 02/04/2023) |
| 02/04/2023 | 27 | RESPONSE in Opposition by James Gordon Meek re 26 MOTION to Revoke *Release Order* (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit) (Gorokhov, Eugene) (Entered: 02/04/2023) |
| 02/06/2023 | 28 | Minute Entry for proceedings held before District Judge Rossie D. Alston, Jr on 2/6/2023 as to James Gordon Meek. US appeared through: Zoe Bedell and Whitney Kramer. Deft appeared w/counsel Eugene Gorokhov. Matter on for US' Appeal of the Decision of the Magistrate Judge/US' 26 Motion for Revocation of Release Order. US adduced evidence through: Tonya Griffith - Govt Exhibit 1 (Affidavit) - Admitted. Argument heard. Defendant to be detained pending trial. Defendant remanded. (Court Reporter: T. Harris)(tarm) (Entered: 02/06/2023) |
| 02/06/2023 | 29 | ORDER granting 26 Motion to Revoke the Release Order; and it is Further Ordered that Magistrate Judge Vaala's Order Setting Conditions of Release (Dkt. 16) is hereby revoked and that Defendant James Gordon Meek shall be detained pending trial. Signed by District Judge Rossie D. Alston, Jr on 2/6/2023. (tarm) (Entered: 02/06/2023) |
| 02/08/2023 | 30 | Consent MOTION for Protective Order by USA as to James Gordon Meek. (Attachments: # 1 Proposed Order)(Bedell, Alexandra) (Entered: 02/08/2023) |

JA4

https://ecf.vaed.uscourts.gov/cgi-bin/DktRpt.pl?173534640172609-L_1_0-1

| 02/09/2023 | 31 | TRANSCRIPT of Proceedings held on 2/6/2023, before Judge R. Alston. Court reporter/transcriber Tonia Harris, Telephone number 703-646-1438. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 3/13/2023. Redacted Transcript Deadline set for 4/11/2023. Release of Transcript Restriction set for 5/10/2023.(harris, tonia) (Entered: 02/09/2023)** |
| --- | --- | --- |
| 02/10/2023 | 32 | NOTICE OF APPEAL (Interlocutory) by James Gordon Meek Filing fee $505, receipt number AVAEDC-8796535. (Gorokhov, Eugene) (Entered: 02/10/2023) |
| 02/10/2023 | 33 | Transmission of Notice of Appeal to 4CCA as to James Gordon Meek to US Court of Appeals re 32 Notice of Appeal - Interlocutory (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (Dest) (Entered: 02/10/2023) |
| 02/13/2023 | 34 | USCA Case Number 23-4082 4th Circuit, Case Manager Jeffrey S. Neal for 32 Notice of Appeal, filed by James Gordon Meek. (Dest) (Entered: 02/13/2023) |
| 02/15/2023 | 35 | Amended MOTION for Protective Order by USA as to James Gordon Meek. (Attachments: # 1 Proposed Order)(Kramer, Whitney) (Entered: 02/15/2023) |
| 02/15/2023 | 36 | Amended Protective Order. Signed by Magistrate Judge Lindsey R. Vaala on 2/15/2023. (nneb) (Entered: 02/15/2023) |

| **PACER Service Center** | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 02/15/2023 12:31:28 | | |
| **PACER Login:** | egorokhov1982 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:23-mj-00032-LRV-RDA |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |
| **Exempt flag:** | Not Exempt | **Exempt reason:** | Not Exempt |

JA5

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 23MJ32 |
| | ) | |
| JAMES MEEK, | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM OF LAW ADDRESSING LEGAL STANDARDS APPLICABLE TO PRETRIAL DETENTION DETERMINATION

James Gordon Meek, through counsel, respectfully submits this memorandum addressing the legal framework applicable to the Court's determination of whether Mr. Meek should be detained pending trial, pursuant to 18 U.S.C. § 3142.

### I.    THE BAIL REFORM ACT.

Under the Bail Reform Act, the Court is required to order detention only where it finds that "*no condition or combination of conditions* will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1) (emphasis added). *See also United States v. Blauvelt*, No. Crim. WDQ-08-0269, 2008 WL 4755840, at *6 (D. Md. Oct. 28, 2008) ("The Bail Reform Act requires a reasonable assurance of the safety of the community, not a guarantee.").

In order to detain the defendant, the Court must find by clear and convincing evidence that no conditions other than detention will reasonably assure the safety of any other person and the community. *United States v. Simms*, 128 F. App'x 314, 315 (4th Cir. 2005) (citing 18 U.S.C. §

JA6

3142(f)(2).  If detention is based on a the risk of flight, the Court must find this factor by a preponderance of the evidence.  *United States v. Stewart*, 19 F. App'x 46 (4th Cir. 2001).

In determining if release conditions exist that will reasonably assure appearance at trial, courts consider: the nature and circumstances of the crime, the weight of the evidence against the person, the history and characteristics of the person, including the person's character, physical and mental condition, family ties, employment, community ties, financial resources and criminal history. 18 U.S.C. § 3142(g).

In this case, pursuant to section § 3142(e)(3)(E), there is a presumption in favor of detention.  However, as will be discussed more fully below, this is a rebuttable presumption.

## II.    THE BURDEN OF PRODUCTION LIES WITH THE DEFENDANT, BUT THE BURDEN OF PERSUASION REMAINS WITH THE GOVERNMENT.

In a "presumption" case such as this one, the defendant (as opposed to the government) has the burden of production to show that he is not a danger to the community, and is unlikely to flee. However, once the defendant comes forward with evidence to rebut the applicable presumption, the burden of persuasion shifts to the government to show that the defendant poses a danger, or is a risk of flight, in accordance with the burdens of proof noted above.  *See, e.g., United States v. Boyd*, 484 F. Supp. 2d 486, 488 (E.D. Va. 2007) ("In [a presumption] case, the burden of production shifts to the defendant to come forward with evidence to suggest that the presumption is unwarranted in his or her particular case. If the defendant successfully rebuts the presumption, the burden returns to the government to prove by a preponderance of the evidence that detention is nevertheless warranted. 18 U.S.C. § 3142(f) (internal citations omitted).

The defendant's burden in this context is not a heavy burden.  It requires the defendant only to "offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe,* 768 F.2d 364, 371, 247 U.S. App. D.C. 247 (D.C. Cir. 1985); *See also United States v.*

2

JA7

*Kurtenbach*, No. 5:17-CR-50071-JLV, 2017 U.S. Dist. LEXIS 121464, at *5-6 (D.S.D. Aug. 2, 2017) ("Once the defendant has met his burden of production, the court cannot rely solely on the presumption in detaining the defendant.  Where a rebuttable presumption of detention exists, "the defendant bears a limited burden of production—not a burden of persuasion—to rebut that presumption by coming forward with evidence [that] he does not pose a danger to the community or a risk of flight.") (quoting *United States v. Abad*, 350 F.3d 793, 797 (8th Cir. 2003) and *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001)); *United States v. Stricklin*, 932 F.2d 1353, 1355 (10th Cir. 1991) (Although a defendant's burden of production "is not heavy," he must introduce at least some evidence); *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991) ("[A] defendant must introduce some evidence contrary to the presumed fact in order to rebut the presumption.").

Respectfully Submitted,

By: /s/ *Eugene V. Gorokhov*
Eugene Gorokhov, Bar No. 73582
*Attorney for Defendant*
BURNHAM & GOROKHOV, PLLC
1424 K Street NW, Suite 500
Washington, DC 20005
(202) 386-6920 (phone)
(202) 765-2173 (fax)

3

JA8

**CERTIFICATE OF SERVICE**

**I hereby certify that I filed the foregoing document VIA ECF which provides a copy**

**to the AUSA of record.**

By: /s/ *Eugene V. Gorokhov*
Eugene Gorokhov, Bar. No. 73582
*Attorney for Defendant*
BURNHAM & GOROKHOV, PLLC
1424 K Street NW, Suite 500
Washington, DC 20005
(202) 386-6920 (phone)
(202) 765-2173 (fax)
eugene@burnhamgorokhov.com

4

JA9

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

UNITED STATES OF AMERICA

v.

JAMES GORDON MEEK

*Defendant.*

Case No. 1:23-mj-32

**NOTICE OF APPEAL**

    Notice is hereby given that the United States of America appeals to the United States

District Court from the order of the Hon. Lindsey R. Vaala releasing the defendant on conditions

of release (ECF No. 13).

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:                     /s/

Zoe Bedell
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Office:   (703) 299-3700

1

JA10

AO 199A (Rev. 6/97) Order Setting Conditions of Release                    Page 1 of ___5___ Pages

# UNITED STATES DISTRICT COURT

_____Eastern_____  **District of**  _____Virginia_____

United States of America

v.

**JAMES GORDON MEEK**
_____
Defendant

## ORDER SETTING CONDITIONS
## OF RELEASE

Case Number: **1:23-mj-32**

IT IS ORDERED that the release of the defendant is subject to the following conditions:

(1)  The defendant shall not commit any offense in violation of federal, state or local law while on release in this case.

(2)  The defendant shall immediately advise the court, defense counsel and the U.S. Attorney in writing before any change in address and telephone number.

(3)  The defendant shall appear at all proceedings as required and shall surrender for service of any sentence imposed as directed. The defendant shall appear at (if blank, to be notified) _____United States District Court_____

  ___401 Courthouse Sq., Alexandria, VA___ on _____**AS DIRECTED**_____
                                              Place
                                              Date and Time

### Release on Personal Recognizance or Unsecured Bond

IT IS FURTHER ORDERED that the defendant be released provided that:

( ✓ ) (4)  The defendant promises to appear at all proceedings as required and to surrender for service of any sentence imposed.

( ) (5)  The defendant executes an unsecured bond binding the defendant to pay the United States the sum of _____ dollars ($_____) in the event of a failure to appear as required or to surrender as directed for service of any sentence imposed.

DISTRIBUTION:   COURT   DEFENDANT   PRETRIAL   SERVICES   U.S. ATTORNEY   U.S. MARSHAL

JA11

AO 199B  (Rev. 10/20)  Additional Conditions of Release

Page 2 of 4 5 Pages

## ADDITIONAL CONDITIONS OF RELEASE

Pursuant to 18 U.S.C. § 3142(c)(1)(B), the court may impose the following least restrictive condition(s) only as necessary to reasonably assure the appearance of the person as required and the safety of any other person and the community.

IT IS FURTHER ORDERED that the defendant's release is subject to the conditions marked below:

( ☑ ) (6)   The defendant is placed in the custody of:
Person or organization   **REED ISBELL**
Address *(only if above is an organization)* _____
City and state _____      Tel. No. _____
who agrees to (a) supervise the defendant, (b) use every effort to assure the defendant's appearance at all court proceedings, and (c) notify the court immediately if the defendant violates a condition of release or is no longer in the custodian's custody.

Signed: _____

_____ _____
Custodian                           Date

( ☑ ) (7)   The defendant must:
( ☑ ) (a)   submit to supervision by and report for supervision to the   **PRE-TRIAL SERVICES**
telephone number _____ , no later than _____
( ☐ ) (b)   continue or actively seek employment.
( ☐ ) (c)   continue or start an education program.
( ☑ ) (d)   surrender any passport to: **PRE-TRIAL SERVICES**
( ☑ ) (e)   not obtain a passport or other international travel document.
( ☑ ) (f)   abide by the following restrictions on personal association, residence, or travel: **DO NOT DEPART THE WASHINGTON DC METRO AREA WITHOUT PRIOR APPROVAL OF THE COURT OR PRETRIAL SERVICES**
( ☑ ) (g)   avoid all contact, directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution, including; _____
( ☑ ) (h)   get medical or psychiatric treatment: **SUBMIT TO MENTAL HEALTH TESTING AND/OR TREATMENT AS DIRECTED BY PRETRIAL SERVICES**
( ☑ ) (i)   return to custody each _____ at _____ o'clock after being released at _____ o'clock for employment, schooling, or the following purposes: **STP SECURE GUNS IN MANOR ACCEPTABLE TO PRE-TRIAL SERVICES    MANNER**
( ☐ ) (j)   maintain residence at a halfway house or community corrections center, as the pretrial services office or supervising officer considers necessary.
( ☑ ) (k)   not possess a firearm, destructive device, or other weapon.
( ☐ ) (l)   not use alcohol ( ☐ ) at all ( ☐ ) excessively.
( ☐ ) (m)   not use or unlawfully possess a narcotic drug or other controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed medical practitioner.
( ☑ ) (n)   submit to testing for a prohibited substance if required by the pretrial services office or supervising officer. Testing may be used with random frequency and may include urine testing, the wearing of a sweat patch, a remote alcohol testing system, and/or any form of prohibited substance screening or testing.  The defendant must not obstruct, attempt to obstruct, or tamper with the efficiency and accuracy of prohibited substance screening or testing.
( ☑ ) (o)   participate in a program of inpatient or outpatient substance abuse therapy and counseling if directed by the pretrial services office or supervising officer.
( ☐ ) (p)   participate in one of the following location restriction programs and comply with its requirements as directed.
( ☐ ) (i)   **Curfew.**  You are restricted to your residence every day ( ☐ ) from _____ to _____ , or ( ☐ ) as directed by the pretrial services office or supervising officer; or
( ☐ ) (ii)   **Home Detention.**  You are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities approved in advance by the pretrial services office or supervising officer; or
( ☐ ) (iii)   **Home Incarceration.**  You are restricted to 24-hour-a-day lock-down at your residence except for medical necessities and court appearances or other activities specifically approved by the court; or
( ☐ ) (iv)   **Stand Alone Monitoring.**  You have no residential curfew, home detention, or home incarceration restrictions. However, you must comply with the location or travel restrictions as imposed by the court.
**Note:** Stand Alone Monitoring should be used in conjunction with global positioning system (GPS) technology.
( ☑ ) (q)   submit to the following location monitoring technology and comply with its requirements as directed:

JA12

## ADDITIONAL CONDITIONS OF RELEASE

( ☐ ) (i)    Location monitoring technology as directed by the pretrial services or supervising officer; or

( ☐ ) (ii)    Voice Recognition; or

( ☐ ) (iii)    Radio Frequency; or

( ☐ ) (iv)    GPS.

( ☐ ) (r)    pay all or part of the cost of location monitoring based upon your ability to pay as determined by the pretrial services or supervising officer.

( ☐ ) (s)    report as soon as possible, to the pretrial sevices or supervising officer, every contact with law enforcement personnel, including arrests, questioning, or traffic stops.

(☑) (t)    RELEASE TO AND RESIDE IN THE THIRD-PARTY OF REED ISBELL AND DO NOT MOVE FROM RESIDENCE WITHOUT PRIOR APPROVAL OF THE COURT OR PRETRIAL SERVICES

U) REFRAIN FROM HAVING ANY CONTACT WITH MINORS UNDER THE AGE OF 18, UNLESS ANOTHER ADULT IS PRESENT WHO HAS BEEN APPROVED, IN ADVANCE, BY PRETRIAL SERVICES

V) SUBMIT TO AND PAY FOR HOME DETENTION, WITH ACTIVE GPS WITH TIMEOUTS AS DIRECTED BY PRETRIAL SERVICES.

JA13

(w) The defendant shall NOT access a computer and/or the internet unless a computer monitoring program has been installed by the probation office. The defendant shall consent to the installation of computer monitoring software on any computer which the defendant has access. Installation shall be performed by the probation officer. The software may restrict and/or record any and all activity on the computer, including the capture of keystrokes, application information, internet use history, email correspondence, and chat conversations. The defendant shall not remove, tamper with, reverse engineer, or in any way circumvent the software. The cost of the monitoring will be paid by the defendant.

(x) Refrain from possessing or utilizing any video gaming system and console, phones with internet capabilities, or other such devices which would enable contact and/or sharing of data with other individuals known or unknown to the defendant; and

(y) Submit to, and pay for, sex offender evaluation and/or treatment conducted by a certified sex offender treatment provider as directed by the supervising officer and sign all appropriate release forms; and

AO 199C (Rev. 09/08) Advice of Penalties                                    Page ____ of ____ Pages

## ADVICE OF PENALTIES AND SANCTIONS

**TO THE DEFENDANT:**

**YOU ARE ADVISED OF THE FOLLOWING PENALTIES AND SANCTIONS:**

Violating any of the foregoing conditions of release may result in the immediate issuance of a warrant for your arrest, a revocation of your release, an order of detention, a forfeiture of any bond, and a prosecution for contempt of court and could result in imprisonment, a fine, or both.

While on release, if you commit a federal felony offense the punishment is an additional prison term of not more than ten years and for a federal misdemeanor offense the punishment is an additional prison term of not more than one year.  This sentence will be consecutive (*i.e.*, in addition to) to any other sentence you receive.

It is a crime punishable by up to ten years in prison, and a $250,000 fine, or both, to: obstruct a criminal investigation; tamper with a witness, victim, or informant; retaliate or attempt to retaliate against a witness, victim, or informant; or intimidate or attempt to intimidate a witness, victim, juror, informant, or officer of the court.  The penalties for tampering, retaliation, or intimidation are significantly more serious if they involve a killing or attempted killing.

If, after release, you knowingly fail to appear as the conditions of release require, or to surrender to serve a sentence, you may be prosecuted for failing to appear or surrender and additional punishment may be imposed.  If you are convicted of:

(1) an offense punishable by death, life imprisonment, or imprisonment for a term of fifteen years or more – you will be fined not more than $250,000 or imprisoned for not more than 10 years, or both;
(2) an offense punishable by imprisonment for a term of five years or more, but less than fifteen years – you will be fined not more than $250,000 or imprisoned for not more than five years, or both;
(3) any other felony – you will be fined not more than $250,000 or imprisoned not more than two years, or both;
(4) a misdemeanor – you will be fined not more than $100,000 or imprisoned not more than one year, or both.

A term of imprisonment imposed for failure to appear or surrender will be consecutive to any other sentence you receive.  In addition, a failure to appear or surrender may result in the forfeiture of any bond posted.

### Acknowledgment of the Defendant

I acknowledge that I am the defendant in this case and that I am aware of the conditions of release. I promise to obey all conditions of release, to appear as directed, and surrender to serve any sentence imposed. I am aware of the penalties and sanctions set forth above.

_____
*Defendant's Signature*

_____
*City and State*                               *Telephone Number*

### Directions to the United States Marshal

( ☐ )  The defendant is ORDERED released after processing.
( ☑ )  The United States marshal is ORDERED to keep the defendant in custody until notified by the clerk or judge that the defendant has posted bond and/or complied with all other conditions for release. If still in custody, the defendant must be produced before the appropriate judge at the time and place specified.

Date: __2/1/2023__                              /s/
                                    _____
                                    Lindsey R. Vaala
                                    United States Magistrate Judge

DISTRIBUTION:    COURT    DEFENDANT    PRETRIAL SERVICE    U.S. ATTORNEY    U.S. MARSHAL

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:23-mj-32 |
| JAMES GORDON MEEK | |
| *Defendant.* | |

### <u>UNITED STATES' MOTION FOR REVOCATION OF RELEASE ORDER</u>

The United States of America respectfully moves the Court to revoke the February 1, 2023, order releasing the defendant on conditions of pretrial release. Because the defendant has a troubling and extensive pattern of trafficking child pornography and engaging with minors online—including pressuring a minor to produce and send sexually explicit images of herself, and posing as a minor to engage in sexual discussions with other minors—the defendant cannot overcome the presumption that no conditions of release can ensure the safety of the community.

### <u>BACKGROUND</u>

On January 31, 2023, the Honorable Lindsey R. Vaala signed a complaint and arrest warrant charging James Gordon Meek with one count of transportation of child pornography in violation of 18 U.S.C. § 2252(a)(1). The complaint affidavit also detailed Meek's involvement in the distribution and receipt of child pornography, including images and videos depicting the sexual abuse of infants and prepubescent children. *See* Ex. A (Compl. Aff.). Moreover, the affidavit detailed the defendant's online engagements and attempted engagements with minors across numerous internet platforms, including pretending to be a young girl. Law enforcement located nude images of a minor and conversations between her and the defendant in which the defendant

JA16

manipulated the minor based on her affection for a public figure. The minor stated in an interview that the defendant had pressured her to create and send him images that would constitute child sexual abuse material ("CSAM").

The defendant was arrested on January 31, 2023. He made his initial appearance before Judge Vaala on February 1, 2023, at which time the court conducted preliminary and detention hearings. During the hearing, the government admitted the complaint affidavit into evidence, and the testifying agent adopted its contents as her testimony. Acknowledging it was a "close call," the court ordered the defendant released pending trial under conditions. ECF No. 16. The government notified the court of its intent to seek district court review, pursuant to 18 U.S.C. § 3145(a)(1).

## ARGUMENT

**A.     The Court has authority to revoke the Order of Release, and a rebuttable presumption of detention exists in this matter.**

The government may seek de novo review by a district court of a magistrate judge's order releasing a defendant. 18 U.S.C. § 3145(a). The district court may review the evidence before the magistrate judge or conduct its own evidentiary hearing. *United States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990). If the court finds by clear and convincing evidence that no "condition or combination of conditions will reasonably assure . . . the safety of any other person and the community," the Court "shall order the detention of the person before trial." 18 U.S.C. § 3142(e).

In this case, there is a rebuttable presumption that no condition or combination of conditions will suffice because there is probable cause to believe that the defendant committed an offense involving a minor victim. *See* 18 U.S.C. § 3142(e)(3)(E).

2

JA17

**B.   The egregious nature of the offense, the ample evidence in this case, the defendant's lengthy pattern of engaging in this conduct, and the danger he poses to the community weigh strongly in favor of detention.**

_Nature and circumstances of the offense._ While the defendant is currently charged with transportation of child pornography, the affidavit reveals that his offense conduct is much more extensive. The transportation offense itself involves the distribution and receipt of child pornography with individuals that the defendant apparently sought out online for the purpose of discussing violent sexual fantasies about child abuse and exchanging CSAM. The defendant was a member of at least one community dedicated to the exchange of CSAM, and he actively contributed to the group. As a result, the defendant faces at least a five-year mandatory minimum.

Even more concerningly, the defendant has a history and pattern of engaging and trying to engage in sexual conduct and conversations with minors online. For example, a minor victim told law enforcement that the defendant pressured her to send pictures depicting sexually explicit conduct. Law enforcement found 11 images of this minor on the defendant's phone, including nude images with her breasts and pubic region exposed. Law enforcement also located a chat between the defendant and the minor in which he manipulated her by offering access to the public figure he knew she "love[d] most in the world." In other instances, the defendant concealed his identity while he engaged in these online exploits with minors. He even posed as an adolescent girl, using that persona to engage in sexual conversations with other young girls.

The defendant's interests in CSAM are broad. The evidence reveals a man interested in trading images depicting everything from the rape of infants, to the bondage and S&M treatment of prepubescent boys, to the sexual exploitation of late adolescents. His conduct spans multiple platforms and years. His devices contained conversations with minors on Snapchat, Instagram, and Omegle, among others. The evidence spans numerous devices and nearly a decade of time. The defendant had CSAM on his devices dating back to at least 2014, and electronic records indicated

3

JA18

he was saving CSAM onto his hard drive as recently as at least January 2022, just a few months before the search of his residence. These are deeply engrained—and criminal—habits that are not quickly or easily changed.

*Nature and seriousness of danger to the public.* It is well-established that victims of the exploitation that occurs during the production and trafficking of CSAM often bear profound burdens encompassing the original trauma and beyond—and that the suffering caused by this sexual abuse often continues for the rest of their lives. "Every instance of viewing images of child pornography represents a renewed violation of the privacy of the victims and a repetition of their abuse." Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 501(2)(D), 120 Stat. 587, 624 (2006) (codified at 18 U.S.C. § 2251 note). Of course, the defendant did not just view—he distributed. As courts have regularly recognized, "[s]uch images are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation'" *United States v. Burgess*, 684 F.3d 445, 459 (4th Cir. 2012) (internal quotation marks omitted). These children, "who must live with the knowledge that adults like [the defendant] can pull out a picture or watch a video that has recorded the abuse of [them] at any time," "suffer a direct and primary emotional harm when another person possesses, receives or distributes the material." *United States v. Sherman*, 268 F.3d 539, 547-48 (7th Cir. 2001). In some cases, victims of CSAM trafficking are hounded by strangers even as adults; there is little prospect of an end to the torment.

*Weight of the evidence.* The weight of the evidence is overwhelming. The messages and images were located on devices found throughout the defendant's home—where he lived alone. The devices contained numerous indications that they belonged to him, including his personal accounts and data. They had been used to engage in illegal activities in close proximity to when he had used them for other business and personal affairs.

4

*History and characteristics.* At the hearing, defense counsel relied heavily on the defendant's standing in and contribution to the community. But he maintained that place in the community *while engaging* in both the trafficking of child sexual abuse material and exploiting and attempting to exploit minors online. He even messaged with his own family members in the same time periods he traded CSAM and engaged in sexual discussions with strangers on the internet. The defendant has proven capable of living a multi-faceted life, keeping the illegal conduct separate and hidden from the rest.

The defendant may also pose a danger to himself. When law enforcement searched his home, he told them that his life was over. He has quit his job and moved out of his home. Though the conditions imposed by the magistrate court restrict his access to his guns, he clearly has familiarity and comfort with firearms and knows where to obtain them. Based on the defendant's history and characteristics, he poses a significant danger to the community, including himself.

**C.      The defendant cannot rebut the presumption that no conditions can assure the safety of the community.**

Because the defendant's crimes have been committed online, the primary condition to police his behavior will be electronic monitoring. However, electronic monitoring has significant limitations. As an initial matter, it only works on devices known to pretrial services. Obtaining additional phones is cheap and easy, and nearly impossible for a third-party custodian to prevent or monitor. Moreover, electronic monitoring *detects* misbehavior, but does not *prevent* it before it happens. Once electronic monitoring identifies a problem—which necessarily occurs after the fact—the harm to the community, and to those minors, has already occurred.

The defendant's illegal conduct is pervasive, wide-ranging, and long-standing. The defendant has proven adept at concealing it from everyone in his life. The government respectfully requests that the Court revoke the order of release and detain the defendant pending trial.

JA20

Respectfully submitted,

Jessica D. Aber
United States Attorney


By:  _____/s/_____

Zoe Bedell
Assistant United States Attorney
Whitney Kramer
Special Assistant United States Attorney (LT)
United States Attorney's Office
2100 Jamieson Ave.
Alexandria, Virginia 22314
Phone: 703-299-3700
Email: Zoe.Bedell@usdoj.gov

6

JA21

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:23-MJ-32 |
| JAMES GORDON MEEK | **Filed Under Seal** |
| *Defendant*. | |

**AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Tonya Sturgill Griffith, being duly sworn, depose and state as follows:

**BACKGROUND**

1.     I am a Special Agent with the FBI and have been since February of 2002. As such, I am authorized to investigate violations of laws of the United States, and to execute warrants issued under the authority of the United States. Since July 2010, I have been assigned to the Washington Field Office's Child Exploitation and Human Trafficking Task Force.  As an FBI Special Agent, I investigate federal violations concerning child pornography, the sexual exploitation of children, sextortion, and related offenses. I have gained experience through training and work related to conducting these types of investigations. I am a trained and certified digital extraction technician for the FBI.

2.     This affidavit is submitted in support of a criminal complaint charging JAMES GORDON MEEK with transportation of child pornography, in violation of 18 U.S.C. § 2252(a)(1). That statute prohibits any person from "knowingly transport[ing] or ship[ping] using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer or mails, any visual depiction, if the producing of such visual

1

JA22

depiction involves the use of a minor engaging in sexually explicit conduct, and such visual depiction is of such conduct."

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers, witnesses, and/or agencies.  Because this affidavit is being submitted for the limited purpose of demonstrating probable cause in support of a criminal complaint, I have not included every fact known to law enforcement concerning this investigation.  Rather, I have set forth certain facts intended to establish probable cause to support the complaint.

**SUMMARY OF PROBABLE CAUSE**

**A.      Initiation of Investigation**

4.      The investigation was initiated from an investigative lead sent to the Washington Field Office's Child Exploitation and Human Trafficking Task Force. The lead stated that on March 11, 2021, Dropbox filed a CyberTip with the National Center for Missing and Exploited Children (NCMEC) regarding child pornography found in a Dropbox account on March 10, 2021. The CyberTip reported that a Dropbox account user had uploaded five videos to Dropbox that were later confirmed by law enforcement to contain child pornography. The username associated with the account was "James Meek," and the CyberTip contained IP addresses that were subsequently determined to be assigned to MEEK, at an address in Arlington, VA (MEEK's RESIDENCE).

5.      Based on this and other investigative information, a search warrant was obtained for MEEK's RESIDENCE.  On April 27, 2022, the search warrant was executed at MEEK'S RESIDENCE by members of the Washington Field Office Child Exploitation and Human Trafficking Task Force.  MEEK alone was present at the RESIDENCE; law enforcement officers

2

JA23

believe that the RESIDENCE had no permanent residents other than MEEK at the time. Several electronic devices were collected from the residence and subsequently searched.

**B.    Evidence of Transportation of Child Pornography**

6.    Law enforcement seized an iPhone 8 from an entry table by the door to MEEK's RESIDENCE. The device was powered on and password protected at the time it was located and collected.

7.    The iPhone 8 contained three chat conversations in which the username "Pawny4" was engaging in sexually explicit conversations where the participants expressed enthusiasm for the sexual abuse of children. In two of those conversations, Pawny4 received and distributed child pornography image and video files through Kik, an internet-based messaging platform.

8.    Forensic review of the iPhone 8 showed that between February 26, 2020, and February 27, 2020, Pawny4 and USERNAME 2[1] exchanged child pornography and messaged on Kik about their mutual interest in the sexual exploitation of children. USERNAME 2 identified as a 25-year-old male, and when Pawny4 asked, "Love kids?", USERNAME 2 responded, "Yesss" and "mmmm im glad I found someone likeminded". Pawny 4 and USERNAME 2 exchanged pictures of their penises and continued their conversation (spellings as in original):

> **USERNAME 2:** Youre so sexy. I want your cock while those kids suck me
> **USERNAME 2**: Its so beautiful
> **USERNAME 2**: I love your cock
> **Pawny4:** Have you ever raped a toddler girl? It's amazing
> **USERNAME 2**: itsmy dream
> **Pawny4**: Do you have any pictures of bitches?
> **USERNAME 2**: I want you with me fucking her together while we kiss and use her
> **USERNAME 2**: I have a vid
> **Pawny4**: I would give anything to do that
> **Pawny4**: Show it

---

[1] The usernames used throughout this affidavit are known to law enforcement but are omitted to protect the integrity of ongoing law enforcement investigations.

**USERNAME 2**: Sadly not as young as id like
**Pawny4:** Send me a video so I can see you stroking that gorgeous cock

9.      USERNAME 2 then sent Pawny4 a video focused on the genital area of an apparent minor female depicting a female using her fingers to masturbate her vagina. The female appeared to be between a pre-adolescent and adolescent, and there was no visible hair on her visible pubic region. The female stated several times during the video, "Daddy fuck me".

10.      Shortly thereafter, USERNAME 2 told Pawny4 "Id give anything to rape toddlers with you". Pawny4 responded "I think I'm in love with you" and sent a video that was 1 minute and 14 seconds in length depicting an erect penis penetrating the anus of a female infant. Throughout the duration of the video, the infant can be heard loudly crying and screaming. The man continues to rape the infant despite her screams and becomes more forcible in the penetration of her anus as the video progresses. Shortly after sending this video, Pawny4 said "I wish I could lick up all that cum all over that little baby that he just raped". Pawny4 later stated "I wish you came on a toddler we just raped hard" and "Wishing I was licking your cum off a bald labia". Pawny4 sent USERNAME 2 at least one more image and one more video depicting child pornography.

11.      Between February 26, 2020, and February 28, 2020, Pawny4 and USERNAME 3 exchanged child pornography files and messaged on Kik about the sexual exploitation of children. USERNAME 3 identified himself as a 22-year-old male, and when Pawny4 asked "Love kids?", USERNAME 3 responded, "I do". Pawny4 sent an image of a prepubescent girl on the beach with her chest exposed, and then stated "Rape this little bitches mouth with that gigantic cock". USERNAME 3 responded, "I'd love to get her little throat bulging". Pawny4 shared an image of a nude woman breastfeeding two infants at the same time and shared his fantasies about raping the woman, licking USERNAME 3's semen off the woman and her children, and impregnating the

4

woman. Pawny4 also referenced another conversation he was having with a 21-year-old woman who wanted him to impregnate her so that they could sexually abuse their child together.

12.     Pawny4 and USERNAME 3 continued to chat about masturbating and wanting to see each other. Pawny4 stated "Just to be able to spread my semen all over some nice big fat tits and a naked little girl would be a dream come true. Start raping her ass in infancy and try to get my cock inside her pussy by age 3 as her mother masturbates next to us". On February 26, 2020, Pawny4 sent to USERNAME 3 the same video depicting the anal rape of an infant discussed above.

13.     Pawny4 sent USERNAME 3 via Kik approximately four additional images depicting child pornography. The last image of child pornography, depicting a prepubescent girl with apparent semen on her stomach immediately above her exposed genitalia, was sent on the morning of February 27, 2020.

14.     The telephone number connected to the SIM card in the iPhone 8 was the same number that law enforcement had previously determined was associated with MEEK's Dropbox and Gmail account. The device name was "Bone Machine", and the sync host name was "Computer: crimson ghost\User: JAMES G. MEEK".[2] The Gmail address associated with the Dropbox account listed in the CyberTip was found on the iPhone8, associated to a Dropbox account and an iCloud account. The iPhone 8 contained a Skype account with the username "8:meekwire" and the account name "@meekwire". Finally, the phone included health data for MEEK.

15.     Travel records and evidence from the iPhone 8 indicate that from February 24,

---

[2] The sync host name indicates the iPhone 8 was connected to a device named "crimson ghost" under the user profile "JAMES G. MEEK".

2020, to February 28, 2020, MEEK was located in the area of Charlotte, North Carolina and/or Rock Hill, South Carolina. American Airlines records demonstrate that MEEK traveled on a flight from Charlotte, North Carolina, to Ronald Reagan Washington National Airport, within the Eastern District of Virginia, on February 28, 2020, at 12:57 PM.

16.    Evidence from the iPhone 8 indicates that MEEK carried this phone with him during his travel from North Carolina to Virginia. For example, text messages recovered from the phone indicate it was used to send several text messages throughout the period of MEEK's travel. Among other evidence, the phone contained a message dated February 26, 2020, MEEK texted a friend that he was in South Carolina, as well as messages dated February 28, 2020, in which MEEK discussed going to the airport, as well as MEEK's messages to family members coordinating their joining him at his residence in Virginia that evening.

17.    Additionally, on or about October 25, 2021, Kik provided records related to the Pawny4 account that indicated that the device used to access the Pawny4 Kik account was an iPhone.  Kik also provided IP addresses used to access the account during the relevant time frame. From between February 24, 2020, and approximately 12:52 PM UTC on February 28, 2020, open-source information indicates the IP addresses geolocated to locations in North and South Carolina. The next IP address used to access the Pawny4 Kik account several hours later geolocated to Arlington, Virginia.

18.    Furthermore, I know from my training and experience and from information provided by Kik, that a user can only be logged into a Kik account from one device at a time.  If the user logs into their Kik account from another device, the Kik account will be logged out on the first device and chat messages are deleted.

19.    Between at least February 25, 2020, and March 9, 2020, Pawny4 also engaged in a

JA27

Kik chat with USERNAME 1 in which he described a fantasy of abducting, drugging, and raping USERNAME 1 when she was a 12-year-old girl. Pawny4 also sent USERNAME 1 images of women breastfeeding. At least some of this conversation occurred within two hours of when MEEK used the phone to communicate with his family member.

20.     Law enforcement also located approximately 100 additional images depicting children engaged in sexually explicit conduct on the iPhone 8. Most or all of these images were thumbnails and/or stored in cache memory.

**C.    Other Evidence of Distribution of Child Pornography**

21.     Law enforcement also seized a 2TB Silicon Power external hard drive from MEEK's kitchen table during the execution of the search warrant. A review of the external hard drive indicated that it primarily contained back-ups of images and videos from other devices. Several folders were labeled "i6", and there were folders titled "i5c lacie only", "i4a", "i4d", "i5a", "i6 lacie only", and "i8pix080718a". The folder labeled "i8pix080718a" contained a subfolder called "Bone Machine", which was the device name for MEEK's iPhone 8. Based on my training and experience, the structure and names of these folders indicate they were organized by iPhone model. There were also several zip files that were labeled with "iCloud Photos" followed by a number and ".zip", for example "iCloud Photos 26.zip".   Based on my training and experience, the folders and zip files indicate these folders are backups for pictures and videos from an iCloud account.

22.     The external hard drive contained an image titled "IMG_6817.PNG" that depicted a screenshot of the messaging application Telegram on an Apple device. The image was stored at the location pipehitter\0-iphone pix backup072220\iCloud Photos 6, which, as discussed, appears to indicate that the image was saved down to the hard drive from an iCloud backup. At the top of

JA28

the screenshot, the date on the Apple device was displayed as Sunday, April 5. The messaging application depicted the different chat threads on the left side, and the contents of a group chat on the right side. The top chat thread, which was the thread that was displayed on the right side, was titled "Cocks, Cunts, and Kids." The group's profile picture depicted a child eating a popsicle. The contents of this group chat were partially visible behind a bubble depicting the names of the group chat members. There were 13 members in the group chat and two were active at the time of the screenshot.

23.    The last message sent on the group chat was from the user of the messaging application on the device where the screenshot was taken. In the second-to-last message in the group, another user in the chat had commented that people in the group were not sharing videos and photos anymore. The last message, sent in response, contained at least one video. The frozen frame of that video depicted a young girl performing or about to perform oral sex on a man's visible erect penis, with a circle with a triangle in the center of the image indicating that it was a video. The user sending this video also stated, "Not everyone is as prolific as you." This message was sent at 11:07 AM, and it contained two check marks indicating the message had been delivered to the server, and that a user had opened the chat since the message had been delivered.

24.    A search warrant for MEEK's iCloud account was obtained on November 14, 2022. The iCloud account contained backups of at least two of MEEK's devices, and the contents of the backup included significant numbers of photos of MEEK's family members and bills addressed to him at his known residence. During a review of the search warrant return, law enforcement located another copy of this screenshot. This second image contained metadata reflecting the image's creation on April 5, 2020, at 11:07 AM UTC.

25.    Another image located during the review of the iCloud search warrant return

JA29

depicted the Woodrow Wilson Bridge as seen from the vicinity of Jones Point Park in Alexandria, Virginia, within the Eastern District of Virginia. That image was created with the rear camera of an iPhone 8 on April 5, 2020, at 17:52 UTC. This image indicates MEEK was located in the Eastern District of Virginia at the time the child pornography video was distributed on Telegram, as discussed above.

26.     The external hard drive also contained an image titled "IMG_5333.PNG", saved in a folder titled "iphone pix backup", which depicts a screen shot of an iPhone with the open applications/window shown as tiles. The open windows include the Safari internet browser with "Omegle" website displayed (other evidence, discussed below, indicates that MEEK used Omegle to chat with and attempt to chat with purported minors); a photo album with the heading "Tandies" with several breastfeeding images visible (the iPhone 8 contained an Instagram account with the username "TandiesClare" that purported to be collecting images of and stories about women breastfeeding, one of MEEK's known interests); the Kik application; and a window that is only partially visible that appears to be the internet-based chat application Telegram.

27.     The apparent Telegram tile shows a chat log containing several images on the right side of the chat, indicating they were sent from the user of that account. The images appear to be videos, as they include time stamps in the upper left corner. The images were sent at 1:33 PM and contain two check marks indicating the message had been delivered to the server and that the conversation had been opened once the message was present.

28.     The sent images are consistent with child pornography. Also visible is a still image of a video that appears to be 1:30 in length. Based on my training and experience, I know this to be part of a series of child pornography images and videos known to law enforcement and contained in a NCMEC database of identified children.

9

29.     This image shows a created date of January 12, 2022, but law enforcement believes this is the date that the image was either saved to the hard drive or to the iCloud backup, not the date the photo was taken.

**D.    Evidence of MEEK Engaging with Minors and Suspected Minors Through Snapchat**

30.     Forensic review of MEEK's iPhone 8 revealed that the phone contained a Snapchat account with the username "hoolijax," as well as several Snapchat conversations with unidentified females. A review of an iPhone 6 seized from MEEK's RESIDENCE revealed the Snapchat username "hoolijax" had a Snapchat story associated with this phone.

31.     A review of the Snapchat conversations stored on the iPhone 8 revealed a Snapchat conversation from between February 29, 2020. and March 2, 2020, between "hoolijax" and IDENTIFIED MINOR 2. IDENTIFIED MINOR 2 was a minor in 2020.

32.     The stored communications did not appear to be the entirety of the Snapchat conversation, and the conversation only contained text messages (i.e., there were no pictures or videos found).  The communication started with hoolijax asking "Who do you love most in the world?" IDENTIFIED MINOR 2 responded with the name of a public figure ("public figure 1"). Hoolijax went on to say, "She's worthy of that big love. You are a beautiful girl and she should feel blessed that you love her more than anyone."  Later in the conversation, hoolijax stated, "I know someone who knows her really well.  I thought I could help you.  I won't ask you anymore questions."  IDENTIFIED MINOR 2 then responded, "What" and "What did she say".  Hoolijax went on to say "She talked to my friend about you", "She doesn't hate you", and "I'll find out more tomorrow from him".

33.     The iPhone 8 also contained an image titled "5003.JPG" that depicts a screenshot of a Snapchat photograph.  The image depicts the username for IDENTIFIED MINOR 2 on the

JA31

top of the image, and the image is focused on the nude body of IDENTIFIED MINOR 2. The breasts, abdomen, and pelvic area of IDENTIFIED MINOR 2 are visible. At the bottom of the image is a text banner that states "Tell [public figure 1] to talk to me or I am getting Snapchat". The creation date for the image was December 15, 2019.

34.    A review of images from the external hard drive revealed approximately 11 images of IDENTIFIED MINOR 2. One image, titled IMG_3379.PNG and dated January 12, 2022, (likely the date the image was saved to the hard drive) depicted a screenshot of a Snapchat image. IDENTIFIED MINOR 2's Snapchat username was visible at the top of the image. The image depicted IDENTIFIED MINOR 2 with her shirt pulled up to expose her breasts, and her pants pulled down to expose her pubic region. The bottom of the image contains a text banner that states "Who's little girl do I belong to". Two additional images also displayed IDENTIFIED MINOR 2's pelvic area, but her vagina was not visible through the pubic hair.

35.    Law enforcement interviewed IDENTIFIED MINOR 2, who confirmed that MEEK and other men had approached her through Snapchat and had pressured her to provide pictures depicting sexually explicit conduct.

47.    Review of the electronic devices seized during the search warrant has also resulted in significant evidence that MEEK has engaged directly, and attempted to engage, with minors online on platforms and applications other than Snapchat.

48.    Law enforcement located images of MEEK video chatting with self-identified minors on Omegle on the external hard drive. Omegle is a communication platform in which a user can be randomly matched with another user for an anonymous text communication, video communication, or both. It is possible for Omegle users to enter search terms that make it more likely to be matched with certain categories of people, including likely minors.

11

JA32

49.    For example, an image on the external hard drive titled "IMG_6957.JPG" depicts the screen of another device. Visible on that screen is an Omegle video chat. The other person in the chat (identified as "Stranger" per Omegle convention) identified themselves as 14 years old in the text portion of the chat and provided their Kik username.  MEEK's portion of the video chat was also visible in the image.  MEEK's nude abdomen, legs, and penis were visible.  MEEK can be seen holding his penis with his left hand.  This image was taken with an Apple iPhone 6, and the creation date of the image was December 20, 2016. A file on the external hard drive titled "IMG_7388.JPG" depicts a similar Omegle chat in which the other participant in the chat identified herself as 15 years old and provided a Snapchat username. MEEK's nude abdomen, legs, and penis were again visible, and MEEK was again holding his penis in his left hand. In this image, however, the video display of the other user was visible, and a female's breasts were exposed. This image was taken with an Apple iPhone 6, and the creation date of the image was December 28, 2016.

50.    Also on the external hard drive, law enforcement located a screen shot titled "IMG_0095.PNG" of a text conversation on an unknown platform.  In the text conversation, a user from whose point of view the text conversation was captured asked "Age?", and the other user responded "I don't want to say lol".  The first user stated, "Say" and "It's fine", and the other user responded, "Ok, I'm basically 15".  The first user then asked, "Would you let me kiss you?". Those are the only portions of this text conversation visible in the screenshot.

51.    Law enforcement also located on the external hard drive several images depicting screen shots of Instagram conversations.  Based on the language and the text of the conversations, as well as the display picture showing what appeared to be a minor female, it appears that MEEK was using an account with the display name "taytayjadar" in which he posed as a minor female to

12

JA33

communicate with other minors on Instagram and solicit pictures.

52.     For example, law enforcement located screen shots of a chat in which taytayjader received pictures from a girl who appears to be a minor. The screen shot conversation revealed the other girl did not want to expose her breasts, and taytayjader responds, "ok why did u say u wud??? Maybe I wouldn't show mine" and "I trust u".  The other girl then responds, "Fine ill show u my boobs".  In another screenshot, Taytayjader said "I like this one the best but I thot u were gonna pose without the shorts lol." Later, when the other user asks "will u take ur panties off? So I can rub my face in there", taytayjader responds "if u wanna see u know what pic u should send next lol".  Although the order of the pictures cannot be determined due to the way the chat was recovered, the girl sends pictures of her exposed breasts, a picture of herself wearing a bra, and pictures of the girl's covered genital region and buttocks.

53.     Finally, the external hard drive contained hundreds of screen shots of girls' social media accounts. Some of these accounts appear to be from dating apps. Many of these accounts depict child erotica; for example, the external hard drive contained at least dozens of screenshots from various social media applications depicting girls doing splits.

## F.     Possession of Child Pornography

54.     During the search of MEEK's RESIDENCE, law enforcement also located an Apple laptop in the living room area on a trunk to the right of the couch. A review of the images and videos on the computer revealed that approximately 90 images and videos of child pornography were located on the device. For example, one video compiles multiple clips, including a scene where an adult female places her tongue on a naked toddler's vagina and a scene where an adult male inserts his penis into a toddler's vagina. This video was located in a Downloads folder on the computer's hard drive.

13

JA34

55.    A review of the external hard drive revealed approximately 58 images and videos of child pornography. For example, one image depicted a nude prepubescent boy with a strap around his face with a device forcing his mouth open; his hands are bound to his feet. The boy is wearing a "Santa Claus" style hat with a bow pictured around his waist above his penis. Another series of images depicted IDENTIFIED MINOR 1 in progressive states of undress, culminating in a picture of her genitals. The pictures of IDENTIFIED MINOR 1 appear to have been saved to the hard drive in November 2014.

56.    As previously discussed, the images and videos of child pornography located on the external hard drive were located in folders that were organized by the respective iPhone backup.

57.    Law enforcement located 1B15 (an iPhone 6) in MEEK's bedroom on top of the nightstand. A review of the images and videos on the device revealed approximately 34 images and videos of suspected child pornography, though law enforcement has not been able to conclusively establish the age of the individuals depicted. For example, an imaged titled IMG_9205.PNG depicts what appears to be an adolescent female with her vagina exposed, and the focal point of the image is on her vagina. The word "Love" is superimposed on the image.

14

**CONCLUSION**

58.    Based upon the above information, I respectfully submit there is probable cause to

believe that JAMES GORDON MEEK transported child pornography, in violation of 18 U.S.C.

§ 2252(a)(1).


Respectfully submitted,

_____
Tonya Sturgill Griffith
Special Agent
Federal Bureau of Investigation


Sworn and subscribed before me by reliable telephonic means
pursuant to Fed. R. Crim. P. 4.1 this 31st day of January, 2023.

Lindsey Vaala    Digitally signed by Lindsey Vaala
                 Date: 2023.01.31 15:04:58 -05'00'

_____
HON. Lindsey R. Vaala
UNITED STATES MAGISTRATE JUDGE

15

JA36

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 23MJ32 |
| | ) | |
| JAMES MEEK. | ) | |

**JAMES MEEK'S OPPOSITION TO THE GOVERNMENT'S**
**MOTION FOR DETENTION**

James Meek, through counsel, respectfully files his opposition to the government's motion

for detention. The controlling legal standards are addressed in detail in Mr. Meek's memorandum

at ECF 8. Under those standards, it is cleae that Mr. Meek is neither a flight risk nor a danger to

the community. Judge Vaala carefully considered the evidence and the recommendation of Pretrial

Services, and ordered Mr. Meek's release. This Court should do the same.

## I.    THE HISTORY AND CHARACTERISTICS OF MR. MEEK.

18 U.S.C. § 3142(g) requires the Court to consider, *inter alia*, the history and characteristics

of the person, including the person's character, physical and mental condition, family ties,

employment, community ties, financial resources and criminal history.

Mr. Meek is 53 years old. He has spent most of his life in Northern Virginia. He is the

father of two daughters, both of whom reside in this area with their mother.[1] Since the search of

his home in April 2022, Mr. Meek has resided with his mother. She has lived in Northern Virginia

since 1963 and owns a home here. Mr. Meek has significant personal and professional ties to this

area. He has no prior convictions or arrests.

---

[1]    Mr. Meek's older daughter is a college student and studies abroad during the school year.

JA37

For over 30 years, Mr. Meek has worked as an investigative journalist, most recently with ABC News. In that time, Mr. Meek has reported on issues including criminal justice, national security, government corruption, war, hostages, torture, human rights abuses, terrorism, and other issues of national and international significance. Mr. Meek has been recognized for his work, including being nominated for five Emmy Awards for his investigations, one of which he won in 2017.[2] He has been the recipient of multiple other awards.[3] Mr. Meek has also served as a Senior Counterterrorism Advisor to the House Homeland Security Committee, where he advised top congressional leaders and held a Top Secret clearance.

Beyond his work as a journalist, Mr. Meek has employed his investigative skills, contacts, and resources to help countless people. He has worked tirelessly to investigate the deaths of US servicemembers to help Gold Star families learn the truth about the deaths of their loved ones. *See* Exhibit 1—Letter of R. Gannon; Exhibit 2—Letter of D. Kimme; Exhibit 3—Letter of D. Sharrett. Mr. Meek has also devoted his time and resources to helping hostages and their families. Exhibit 4—Letter of Rev. K. Day. He has given a public voice to their cases, and used his sources and investigative skills to provide them with details about loved ones' captivity. Mr. Meek's investigations helped to stop widespread human rights abuses by Iraqi security forces.[4] For his humanitarian work involving hostages, Mr. Meek was recently awarded the James W. Foley World Press Freedom Award.[5]

---

[2]    *See* https://www.imdb.com/name/nm8229289/awards (Emmy nominations and awards).
[3]    These include the Overseas Press Club Award (2021), Society of Professional Journalists Awards (2016 and 2018).
[4]    *See, e.g.*, James G. Meek, 'Dirty Brigades': US-Trained Iraqi Forces Investigated for War Crimes, ABC News (March 11, 2015), https://abcnews.go.com/International/dirty-brigades-us-trained-iraqi-forces-investigated-war/story?id=29193253
[5]    *See* Award Announcement at https://myemail.constantcontact.com/The-7th-Annual-James-W--Foley-Freedom-Awards.html?soid=1120967545660&aid=G9BsgJrDHN8. Mr. Meek declined to accept the award, knowing at that time that he was under investigation.

JA38

In August 2021, Mr. Meek contributed to saving the lives of more than 700 Afghan refugees, including four US citizens, by creating a veterans' volunteer group that that shepherded them out of Kabul in the wake of the Biden Administration's withdrawal from Afghanistan.[6]

## II.    NATURE OF THE OFFENSE; WEIGHT OF THE EVIDENCE.

Section § 3142(g) also requires this Court to consider the nature of the offense and the weight of the evidence.  To be sure, offenses involving allegations of child sexual abuse materials are serious.  The weight of the evidence, however, is a matter that merits some discussion.  Despite the fact that the government appears to have been investigating this mater since at least March of 2021, Mr. Meek is charged by a criminal complaint drafted by a member or members of the prosecution team—not by a grand jury indictment.  What is more, at Mr. Meek's preliminary hearing, the government presented the testimony of an agent who was only involved in the case for the last several months, had limited knowledge of the investigation, and could not provide even rough approximations of when alleged contraband material was recovered from various devices and accounts.

Moreover, as to the weight of the evidence, there has been no adversarial testing of the weight and reliability of the government's allegations.   While the government has been investigating this matter for a year or more, the first time undersigned counsel received any meaningful information regarding the charges against Mr. Meek was on the morning of Mr. Meek's initial appearance.  But even now, the complaint is all that has been provided to the defense; we have not been provided a shred of discovery.  For all of these reasons, the weight of

---

[6]    Mr. Meek co-authored a New York Times best-selling book that details this operation. Scott D. Mann, OPERATION PINEAPPLE EXPRESS (2022).  Upon learning that he was under investigation, Mr. Meek notified his co-author and publisher, and had his name and details of his involvement removed from the book.  He did this in order to avoid bringing negative attention to the important and heroic stories of those involved.  A prior draft of the book, which was set for publication by Simon & Schuster, can be provided to the Court under seal.

3

JA39

the evidence cannot be reliably determined.  *See, e.g.*, *United States v. Ragin*, 820 F.3d 609, 618 (4th Cir. 2016) (holding that when the prosecution case is not subject to "meaningful adversarial testing . . . the adversary process itself presumptively unreliable.").

Returning to the nature of the allegations, it is important to note what is *not* alleged: there is no allegation whatsoever that Mr. Meek had any physical contact with any minor, and is no allegation that Mr. Meek even *attempted* to meet a minor for improper purposes.  This places Mr. Meek in an entirely different category from those individuals who actually engaged or attempted actual sexual abuse of minors.  And yet, even in such cases, judges in this Court have found pretrial release appropriate.[7]  *A fortiori*, conditions of release can certainly be fashioned in this case, particularly given Mr. Meek's strong ties to the community, record of employment, lack of any criminal record, and extraordinary history of good works and service to the community.  Among the individuals who, aware of the charges, state without hesitation that Mr. Meek will abide by all conditions of pretrial release are: (1) Marion "Spike" Bowman, a retired Chief of the National Security Law Unit of the FBI (Ex. 5); (2) Doug Kimme, a retired police officer with over 26 years of service (Ex. 2); (3) David Sharrett, a Gold Star father who has known Mr. Meek for over 40 years (Ex. 3); Kathleen Day, a Reverend who has known Mr. Meek since 2014 (Ex. 4), and (5) Raymond Gannon, a former FBI Agent with over 28 years of service (Ex. 1).

### III.   MR. MEEK IS NOT A FLIGHT RISK, NOR A DANGER TO THE COMMUNITY OR HIMSELF.

---

[7]      *See, e.g.*, US v. Manuel Delgado, 1:17cr11-JCC (defendant engaged in sexual intercourse with a 13-year-old and was released on conditions) (ECF 2 (affidavit); ECF 11 (release order)); US v. Dean Cheves 1:21cr177-CMH (UD Diplomat who engaged in sexual intercourse and produced videos of the sexual abuse of the minor, released on conditions) (ECF 2 (affidavit); ECF 17) (release order)); US v. Benjamin Moser, 1:08cr258-TSE (defendant traveled to meet a 13-year old for sex in an undercover sting, released on conditions) (ECF 2 (affidavit; ECF 7 (release conditions); US v. Sher Jaghori, 1:13cr451-AJT (defendant produced child pornography images by photographing an 11 or 12 year old family member, ordered released on conditions) (ECF 2 (affidavit); ECF 16 (release conditions); US v. Sameer Nanda, 1:10cr436-AJT (defendant engaged in sexually explicit chats and traveled to meet what he believed to be a 13-year-old in a sting operation, released on conditions) (ECF 2 (affidavit); ECF 25 (conditions of release).

JA40

The government searched Mr. Meek's home on April 27, 2022—over 9 months ago. Since then, Mr. Meek has not been subject to any restrictions on freedom. Yet, Mr. Meek has remained in the area and has taken steps to assure the government that he would be available and cooperative should the government bring charges. Mr. Meek has:

- Continued to reside in Northern Virginia. After moving out of his apartment, Mr. Meek moved in with his mother, and although he was under no obligation, voluntarily informed the government of this fact. Mr. Meek has traveled within the US and always returned to Virgnia;

- Volunteered to surrender his passport to the government, though not required to;

- Relinquished possession of his lawfully-owned and registered firearms, although, again, he no obligation to do so;

- Maintained close ties with his family, including supporting his 15-year-old daughter, and taking care of his mother after she underwent surgery;

- Continued to work on a freelance basis in order to support his daughters, after leaving employment at ABC News.

The government has argued that Mr. Meek may pose a danger to himself based his recognition that his "life is over" when federal agents raided apartment. Yet, all of the evidence suggests the opposite. Over the last nine months, Mr. Meek has:

- Continued to find ways to serve others in need, including volunteering with homeless veterans, supporting friends with health problems, and providing financial and moral support to Afghans who remain in danger, as well as those who were able to escape to safety;

- Focused on his physical and mental health through exercise and therapy;

- Attended church and sought counsel from a trusted member of the clergy.

It is notable that since the fact that Mr. Meek was being federally investigated became public in October 2022.[8] Despite the immense pressure and scrutiny, Mr. Meek has remained in the area, continued to work, and continued to contribute positively to the community.

---

[8]     Tatiana Siegel, FBI Raids Star News Producer's Home, Rolling Stone (Oct. 24, 2022) https://www.rollingstone.com/politics/politics-features/fbi-raid-abc-news_producer-1234613619/

JA41

**CONCLUSION**

For all of the foregoing reasons, Mr. Meek should be released on conditions, consistent

with the recommendation of Pretrial Services and the prior, carefully considered decision of Judge

Vaala.

Respectfully Submitted,

By: /s/ *Eugene V. Gorokhov*
Eugene Gorokhov, Bar No. 73582
*Attorney for Defendant*
BURNHAM & GOROKHOV, PLLC
1424 K Street NW, Suite 500
Washington, DC 20005
(202) 386-6920 (phone)
(202) 765-2173 (fax)

JA42

**CERTIFICATE OF SERVICE**

I hereby certify that I filed the foregoing document VIA ECF which provides a copy to the AUSA of record.

By: /s/ *Eugene V. Gorokhov*
Eugene Gorokhov, Bar. No. 73582
*Attorney for Defendant*
BURNHAM & GOROKHOV, PLLC
1424 K Street NW, Suite 500
Washington, DC 20005
(202) 386-6920 (phone)
(202) 765-2173 (fax)
eugene@burnhamgorokhov.com

JA43

Raymond J. Gannon



Dear Sir:

        I would like to introduce myself to the court. My name is
Raymond J. Gannon and I am a retired FBI Special Agent, having served
for over
 twenty eight years, during the period of 1978 thru 2006. I'm also a
former Officer of the United States Marine Corps serving from 1969 to
1973.
 I have been personally acquainted with James Meek since April of 2018
and consider him a friend to me and my wife, Debra.

 I first me James shoryly after my wife and I had been notified of the
death of my step-son, SFC Jeremiah Wayne Johnson, 14th CRD, 3rd
Special Forces as a result
 of an ISIS ambush on October 4, 2017 in the vicinity of Tongo Tongo,
Niger. It was because of this event and the subsequent attempted
coverup by the Deparment
 of Defence and the US Army, that we reached out to James in an
attempt to uncover the truth about the events surrounding the ambush
and the deaths of four
 American soldiers. James was instrumental in uncovering the real
truth about the events that resulted inthe death of my step-son,
Jeremiah.

 I'm a personal friend of James and would like to assure the court
that I would do anything to insure that James would meet his
obligation to appear before the court
 at all times.


Sincerely yours,


 Raymond J. Gannon


JA44

JA45

February 02, 2023

Dear Judge Alston,

Your Honor,  My name is Doug Kimme and I am writing this letter on behalf of Mr. James Gordon Meek.
I'm a veteran of the U.S. Air Force Special Operations and a retired police officer.  I worked for the Honolulu Police Dept. for 7 yrs. and I retired from the Champaign IL Police Dept. after working there for 19 yrs.
During my time as a Police Officer, I primarily worked the street. My duties also included serving as a firearms-tactical instructor and an Armorer for the Dept. I've been decorated twice for life saving. Once for a female who had overdosed and another for treating one of our officer's after she was shot in the chest when we were ambushed in a park. I've received several Commendations while working for Honolulu P.D. and for Champaign P.D.

During my time as a Police Officer, I had to deal with a multitude of personalities and problems.  Victims and liars.  Good People to murders. I was able to develop a good sense of judgment of people during my investigations and by watching their body language.

From the last 13 yrs. of knowing Mr. Meek I learning early that I could trust him as he investigated and wrote his stories as a journalist for the New York Daily News, concerning the death of my son, U.S. Army PFC Danny Kimme, who was KIA in Iraq. Two other soldiers were also KIA during the same engagement.

Last August, I learned that Mr. Meek was in some type of legal trouble but nothing more than that. Within the last 24 hrs, I learned of the Charges he is facing. I also understand that Mr. Meek is in custody at this time pending trail.

Sir, if at all possible, could Mr. Meek be released pending his trial ?  I have doubts that Mr. Meek would be a flight risk. Especially since he has not fled to avoid arrest during the last 5 months.
I also strongly believe Mr. Meek would comply with any and all Court directives and orders as a condition of his pretrial release.

Sincerely,

Doug Kimme
Fisher IL.

JA46

February 1, 2003

To Whom It May Concern,

  I have known James Meek since he was a freshman at Langley High School in McLean, Virginia. He was a student in my English class in 1983
and then again as a senior in 1987. James was an excellent student who possessed top shelf artistic ability and a keen sense for great literature.
As with many of my former students, James became a friend after he graduated from high school and we occasionally kept in touch. Our paths crossed at one of his class reunions in 2007 that I was fortunate enough to be invited to.

   It was at this event where I shared with James that our son Dave had enlisted in the Army and was deployed in Iraq with the 101st Airborne. At the time, James was working with the New York Daily News and began following where our son was and how his unit was engaged. I still have emails from James detailing the very dangerous nature of what the 101st was doing at the time. The Army was in the middle of "The Surge" and Dave's unit was ground zero for it.
In January, 2008 our son was killed in an ambush. James

JA47

was among the first people I contacted when we received the news.

What followed for our family was a five year ordeal of getting the truth about how our son had died on that day in January.

What I can say is that without the effort that James put into our case, we never would have gotten to the truth of what happened and never would have found the small measure of peace and closure that such an interruption in life can bring.


James worked tirelessly at great cost to give our son the voice that had been taken from him. It speaks to the kind of man we've known him to be. He did this because were friends and because he saw an enormous injustice that needed to be addressed. We could not have given Dave his voice  without the sacrifice of time and energy that James gave.

My wife and I were at a TAPS retreat for Gold Star parents in Nashville in 2018 and met another couple who had experienced a similarly questionable tragedy with their son.

When they heard the ordeal that we'd been through, they approached us and asked how we'd done it. Within an hour, they were on the phone with James, who launched into yet an exhaustive investigation to vindicate the names of brave soldiers who gave their lives for their country.


This is a thread we know that runs through James's life. It speaks of sacrifice and loyalty. We know that James has

had a deep connection to those who've served to protect our country and a willingness to help people in need.

We recently became aware that he was in some kind of great personal distress, and this
 morning we learned that the charges against James are deeply serious and involve child pornography.

We want to express our full confidence that James will be in compliance with his pre-trial release agreement.
To endorse that trust and confidence, we want the court to know that we had asked James to stay at our house recently while we were planning to be out of town. We trusted our home to him. We trust him to be fully compliant with the court.
If there is anything we can do to speak further on his behalf, please let us know.

Dave and Vicki Sharrett
Forest, Virgina

Rev. Kathleen Day



Your Honor,                                                    February 1, 2023

I am writing to you regarding James Meek and the pending decision of releasing him from custody pending trial.  I first came into contact with James in 2014 when four Americans were being held hostage by ISIS.  James devoted an extraordinary amount of time and energy in reporting in such a way as to bring to light the concern, pain and ultimately grief of the families of the hostages held by ISIS.  Over the course of the last 9 years, I have been contacted by James on several occasions asking if I would make myself available to another loved one of an American held hostage abroad, in order to offer comfort, guidance or encouragement.  In his reporting, he gained the trust of families and loved ones of hostages, service members, and those who supported our country's efforts abroad, because he did not exploit their emotions nor risk someone's safety for a headline.  From my conversations with James, it was evident that he remained supportive in the lives of people whose stories he highlighted long after the headlines passed, offering the support and assistance he could provide to ease their pain, promote healing and to pursue justice on behalf of their loved ones.

I have also read the details of the serious charges he faces.  I have some understanding of the weight judges must carry in navigating cases involving such serious charges and a person of notoriety for their efforts to promote justice and lift the voice of those who feel powerless in the face of those who bring these very charges. It is complicated and perplexing on many levels.

My understanding of pretrial norms is that if the person is not believed to be engaging in or at risk of engaging in the criminal actions which they are facing in trial, and not believed to be a danger to society, and if there is reason to believe they will appear in court, that because we as a society hold fast to the concept of innocent until being proven guilty, that pretrial detention is not the norm.  These charges are very serious.  James' long history of steady work, devoted parenting, commitment to justice for those who have suffered, and lack of criminal record seem to me to weigh toward pretrial release.

I have counseled James on spiritual and religious matters, including during this past year.  I believe he will fulfill his responsibility to follow the guidelines and requirements of the court.  In consideration of these serious charges, I commit to do what is within my power and influence to support the court's conditions of release, urge and reinforce compliance with all conditions of pretrial release.

Thank you for your consideration.

Respectfully,

*Rev. Kathleen Day*

JA50

MEMORANDUM FOR THE COURT

SUBJ: James Meek

Permit me to introduce myself. My name is Marion Bowman, but everyone calls me Spike.  I am a retired Navy Captain. For most of my career I was a judge advocate but, before the Navy sent me for the first of my law degrees, I was an intelligence officer.  I mention that because my career has been unusual - most of my 41 years of Government service has been spent in intelligence or using the law to support intelligence and covert operations or unconventional warfare.

In addition to my Naval service, I am retired from the Senior Executive Service of the Federal Bureau of Investigation (FBI) and from the Senior National Intelligence Service of the Director of National Intelligence (DNI). Along the way I spent 16 years teaching graduate school at The George Washington University (GWU).

I'm not sure exactly when I met James, but it was likely around 1996 or 1997, not long after I had retired from the Navy and soon after I had been recruited by the FBI. My task at the FBI had been to build a National Security Law Program within the Bureau to focus on splashy issues like terrorism and espionage, but also more mundane issues related to the national security such as industrial espionage, certain export controls and even support of the FBI to other agencies or support of other agencies to the FBI. My military background, tour of duty at the National Security Agency (NSA) and prosecution of several notorious spies whose perfidy directly affected most agencies, made me a logical lynchpin during a time when agencies did not trust each other.

During my 11 years at the FBI, I was constantly sought out for information relating to my work. I came into almost daily contact with reporters, authors, and persons responsible for programs for which I was asked to contribute/speak, both in the United States and abroad.  I was very cautious in those days because many tried to pry out of me information that necessarily had to be kept confidential.  There were few that I really trusted, but James Meek was one.  As with others, I was cautious with James at first, but it soon became clear to me that he not only could be trusted to be honest but that he only wanted to do as most journalists used to do – report only what was newsworthy and only with the facts that could be corroborated.

After retiring from the FBI, I had a brief stint at the National War College before being recruited by the DNI to become the Deputy National Counterintelligence Executive.  My work in that capacity was not nearly so beckoning to journalists but James and I remained in contact – more as friends than as reporter and source.  We've had lunch a few times. We met up occasionally at conferences where I would be speaking.  I can't say that James and I were ever BFFs (Best Friends Forever) but we were and are friends still. It may be worth mentioning that during my last years of Government service I was one of 9 individuals charged with oversight of all Intelligence Community (IC) special operations programs.

You can appreciate that, with the positions I've held, people with integrity were important to me. And it is the rare journalist/reporter who I trusted. I can count on one hand those that I did trust, not only because of honest reporting, but because they would keep their word.  I write this today because James was one of the fingers on my hand.

I know very little of what brings James to this Court. What I do know is disappointing to me, but it does not destroy my faith in James moving forward. The James I know can be trusted to keep his word. I

JA51

know he will accept judgment, but I've tried literally hundreds of cases in my years, and I know it is common for a judge to ask something of the person before him.  If that should be the case here, James will do whatever is asked of him. He will keep his word.


M.E. Bowman

CAPT USN (ret.)
SES, FBI (ret.)
SNIS, DNI (ret.)
Faculty, GWU (ret.)
Distinguished Fellow, National Security Program, U.Va.

JA52

```
                                                                    1
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
 2                      ALEXANDRIA DIVISION

 3    --------------------------------x
                                       :
 4    UNITED STATES OF AMERICA,        : Criminal Action No.:
                                       : 1:23-mj-32
 5                                     :
            v.                         :
 6                                     :
      JAMES GORDON MEEK,               : February 6, 2023
 7                                     :
                      Defendant.       :
 8    --------------------------------x

 9                 TRANSCRIPT OF MOTION HEARING
             BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.,
10              UNITED STATES DISTRICT COURT JUDGE

11                    A P P E A R A N C E S

12    FOR THE GOVERNMENT:   ALEXANDRA ZOE BEDELL, AUSA
                            WHITNEY KRAMER, AUSA
13                          DOJ-USAO
                            2100 Jamieson Ave
14                          Alexandria, VA 22314

15    FOR THE DEFENDANT:    EUGENE VICTOR GOROKHOV, ESQ.
                            Burnham & Gorokhov PLLC
16                          1424 K St NW
                            Suite 500
17                          Washington, DC 20005

18

19

20

21

22

23    OFFICIAL U.S. COURT REPORTER:    MS. TONIA M. HARRIS, RPR
                                       United States District Court
24                                     401 Courthouse Square
                                       Tenth Floor
25                                     Alexandria, VA 22314
```

─────United States v. Meek─────

2

1          **P R O C E E D I N G S**

2    (Court proceedings commenced at 11:55 a.m.)

3

4          THE COURTROOM CLERK:  Criminal Case No. 2023-mj-32.

5    United States of America versus James Gordon Meek.

6          Counsel, please note your appearances for the

7    record.

8          MS. BEDELL:  Good afternoon, Your Honor.  Zoe Bedell

9    and Whitney Kramer for the United States.

10          MR. GOROKHOV:  Good afternoon, Your Honor.  Eugene

11    Gorokhov here for Mr. Meek, who is present at counsel table.

12          THE COURT:  Good morning, sir.

13          This matter comes on today on an appeal of the

14    magistrate judge's release order.  Counsel, I will let you

15    know that I've had the opportunity to read all of your

16    accompanying briefs and any letters that have been submitted.

17    So I'm well aware of the positions that the parties have taken

18    in this matter.  Having appeared before me before, you all

19    know that I like to try as best I can to get to the real core

20    issue in this case.  And the real core issue in this case is

21    -- and obviously, applying the applicable standard for whether

22    or not Mr. Meek should be given the privilege of being able to

23    remain out on bond, the Court is going to need to make an

24    inquiry into a couple of things.  I'll tell you the things

25    that I'm concerned about both from the government's

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA54

United States v. Meek

3

1  perspective and from the defense perspective.  From the

2  government's perspective, the concern that I voice is that

3  apparently Mr. Meek has been at liberty, until recently,

4  hasn't done anything, which would suggest that we know of that

5  he's gotten involved in any behavior which would cause the

6  court concern that he had the ability during those times to

7  actually flee if he had chosen to do so.  Obviously, we're not

8  encouraging that, but that opportunity was there.  And that he

9  has otherwise appears before the Court with a clean criminal

10  record and no suggestion that he is a person who would not

11  meet his obligation.

12          From the defense standpoint, the concern is this.

13  Number one is that, the allegations, and obviously that's what

14  they are right now.  Allegations are very serious.  There's a

15  presumption of no bond in a case such as this.  And based upon

16  the government's position in the matter, this isn't your -- I

17  can use this term -- "typical case," involving child

18  pornography, but apparently, according to the government, it

19  has taken on another level in that there's suggestion that he

20  was having contact with minors and was going through what we

21  say in the market, the grooming process, as part of his

22  criminal behavior.

23          So those are the two things that jumped out at the

24  Court for consideration from both perspectives.  I'll be happy

25  to hear any evidence, then we can go forward.  Why don't we go

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

JA55

─────United States v. Meek─────

4

1  ahead.

2         Does the government have any evidence that it wants

3  to offer?

4         MS. BEDELL:  Your Honor, we would be offering the

5  complaint affidavit as we did last time so we can proceed with

6  that.  We do have the agent here, but we would not be offering

7  anything additional.

8         THE COURT:  I will tell you I would like to hear

9  from the agent because it was somewhat unclear.  And I'm going

10  to try to be as delicate as I can, that some of the

11  conversations that were supposedly taking place, allegedly,

12  between Mr. Meek and this presumed minor had some, shall we

13  say, rather indelicate language in it, and I was unable to

14  discern from looking at the complaint as to whether or not

15  that indelicate language was from Mr. Meek or someone that he

16  was speaking with.  I was unable to discern that.  So if

17  there's any evidence that would help me to understand whether

18  it was Mr. Meek saying these things or whether it was

19  allegedly -- or some other person, that would be helpful.

20         MS. BEDELL:  And, Your Honor, is there something

21  specific you're looking at there, one of the specific

22  instances of engagement with minors.  I know we have some of

23  the conversations laid out.  Was that where the source of

24  confusion was?

25         THE COURT:  Yes.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA56

─────United States v. Meek─────
                                                    5
                    Griffith - Direct
1          MS. BEDELL:  Okay.  We can clarify that, Your Honor.

2          THE COURT:  All right.

3          MS. BEDELL:  In that case we'll call Tonya Griffith.

4          THE COURT:  Come on up, ma'am.  Ladies and gentlemen

5    in the courtroom, during the course of this proceeding you may

6    hear some indelicate language.  It is necessary for this

7    language to be used in the processing of this case.  If this

8    language is offensive to you or if you feel uncomfortable

9    hearing it, you're free to leave the courtroom at this time.

10   (TONYA GRIFFITH, Government's witness, sworn.)

11                    DIRECT EXAMINATION

12   BY MS. BEDELL:

13   Q.   Good afternoon.  Could you please state your name and

14   spell it, please.

15   A.   It's Tonya Griffith.  It's T-O-N-Y-A, last name is

16   G-R-I-F-F-I-T-H.

17   Q.   How are you employed?

18   A.   I'm an agent with the FBI.

19   Q.   How long have you been employed in that position?

20   A.   Over 20 years.

21   Q.   Could you describe some of your duties?

22   A.   I'm currently assigned to the child exploitation and

23   human trafficking task force.  I primarily work child

24   exploitation online.  So trading, distributing, online

25   production of child pornography, sextortion, those kinds of

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
            EASTERN DISTRICT OF VIRGINIA


JA57

—United States v. Meek—

Griffith - Direct

6

```
 1  violations.
 2  Q.   Are you the lead agent assigned to the matter in court
 3  today?
 4  A.   Yes.
 5  Q.   And when did you become the lead agent on this matter?
 6  A.   A few months ago.
 7  Q.   Did you prepare an affidavit in support of a criminal
 8  complaint in this case?
 9  A.   I did.
10  Q.   And with the assistance of the court security officer, I
11  will pass up what has been marked as Government's Exhibit 1.
12          Do you recognize this exhibit?
13  A.   I do.
14  Q.   What is it?
15  A.   It is the affidavit that I prepared for the complaint.
16  Q.   And what does it contain?
17  A.   It contains some of the facts known to me regarding this
18  investigation.
19  Q.   And is your signature on this document?
20  A.   Yes, it is.
21  Q.   Is the information contained in Government's Exhibit 1 a
22  true and accurate reflection of the facts as known at the time
23  the affidavit was executed?
24  A.   Yes.
25  Q.   Do you have any corrections or additions you need to
```

—Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA

JA58

—————United States v. Meek—————
Griffith - Direct                    7

1  make?

2  A.   No.

3  Q.   For purposes of today's hearing, do you incorporate and

4  adopt the facts as set forth in the affidavit as part of your

5  testimony?

6  A.   I do.

7        MS. BEDELL:  At this time, Your Honor, I would like

8  to move to admit this into evidence.

9        THE COURT:  Without objection.

10       MR. GOROKHOV:  No objection.

11       THE COURT:  Okay.

12  (Government's Exhibit No. 1 was admitted into evidence.)

13  BY MS. BEDELL:

14  Q.   Can you take a look at page 3 of the affidavit and the

15  bottom of that page.

16  A.   Yes.

17  Q.   And displayed here is a conversation that's between

18  username 2 and Ponny 4 [sic], is that correct?

19  A.   Yes.

20  Q.   Which of these is understood to be Mr. Meek's username?

21  A.   Ponny 4.

22  Q.   And for username 2, do you know that individual's true

23  identity?

24  A.   No.

25  Q.   Do you know -- do you believe they are a minor?

—————Tonia M. Harris OCR-USDC/EDVA 703-646-1438—————
EASTERN DISTRICT OF VIRGINIA

JA59

─────United States v. Meek─────
                    Griffith - Direct                    8

1  A.   No.

2           MS. BEDELL:  Court's indulgence, Your Honor.

3           THE COURT:  Yes, ma'am.

4  BY MS. BEDELL:

5  Q.   Just a general question about the affidavit.

6           The number of individuals are referred to by

7  username and then a number, are those individuals understood

8  to be minors at this time?

9  A.   The ones that say "username" are believed to be adults.

10          (A pause in the proceedings.)

11 BY MS. BEDELL:

12 Q.   There's a reference to -- excuse me, username 1.

13          Do you have any reason to believe that individual is

14 a minor?

15 A.   No.

16 Q.   And at the bottom of page 6 and onto page 7, there's a

17 discussion of username 1 -- a conversation with username 1

18 regarding a fantasy.

19          Do you have any reason to believe that happened

20 while username 1 was a minor?

21 A.   No.

22          MS. BEDELL:  Your Honor, does that address some of

23 the confusion or --

24          THE COURT:  Somewhat, yes.

25          MS. BEDELL:  Okay.  Are there any additional

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
                EASTERN DISTRICT OF VIRGINIA

JA60

─────────United States v. Meek─────────
9

1   questions you would like to pose to the agent at this time

2   because otherwise that would conclude my questions.

3           THE COURT:  Just a few.  Obviously, you can

4   follow-up.

5           Ma'am, obviously, during the exchange between the

6   person alleged to be Mr. Meek and the minor, was there anyone

7   else involved in the conversation?

8           THE WITNESS:  With the minor?

9           THE COURT:  Yes.

10          THE WITNESS:  No.

11          THE COURT:  So it was a one-on-one conversation?

12          THE WITNESS:  Yes.

13          THE COURT:  Was that the context of most of the

14  conversations that you were able to discern?

15          THE WITNESS:  With the individuals we believe to be

16  minors, yes, or we have identified as minors, yes.

17          THE COURT:  Have you actually had personal or direct

18  contact with the individual you believe to be a minor?

19          THE WITNESS:  One of them, yes.

20          THE COURT:  Okay.  And based upon your observation,

21  was this person indeed a minor?

22          THE WITNESS:  Yes.

23          THE COURT:  Okay.  All right.  Any questions as a

24  result of the Court's questions?

25          MS. BEDELL:  No follow-up questions from me, Your

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

JA61

──────United States v. Meek──────

Griffith - Cross                                    10

1   Honor.

2            THE COURT:  Mr. Gorokhov.

3                      CROSS-EXAMINATION

4   BY MR. GOROKHOV:

5   Q.   First of all, can you tell the Court -- you said you've

6   been involved in this for the last few months.

7            Can you tell the Court when you got involved in this

8   investigation?

9   A.   I don't remember the exact date, but it was a few months

10  ago.  Approximately three months ago, two or three months ago.

11  Q.   Okay.  Is it fair to say this investigation has been

12  going on for over a year?

13  A.   That's correct.

14  Q.   Now, with respect to your affidavit, do you have that in

15  front of you?

16  A.   Yes.

17  Q.   The -- sorry, Your Honor.

18            Paragraph -- directing your attention to

19  paragraph 6, do you see there's a reference to an iPhone 8?

20  A.   Yes.

21  Q.   That was seized from, allegedly, Mr. Meek's apartment?

22  A.   Yes.

23  Q.   You did not participate in that search, did you?

24  A.   I did not.

25  Q.   Did you participate in the imaging of the phone?

──Tonia M. Harris OCR-USDC/EDVA 703-646-1438──

JA62

─────United States v. Meek─────
Griffith - Cross                                           11

1   A.   I did not.

2   Q.   Did you participate in creation of any reports from the

3   imaging of the phone?

4   A.   No, not the original reports, no.

5   Q.   Did you review the material from the reports?

6   A.   Yes.

7   Q.   Okay.  So basically what you're saying is at some point,

8   when you became involved a few months ago, digital data was

9   handed to you and that's what you reviewed?

10  A.   Yes.

11  Q.   And directing your attention to paragraph 24, which is on

12  page 8.

13  A.   Yes.

14  Q.   There's a reference to an iCloud account there?

15  A.   Yes.

16  Q.   Did you personally review material from an iCloud

17  account?

18  A.   Yes.

19  Q.   Okay.  Did you participate in the imaging of the account?

20  A.   No.

21  Q.   So you didn't do any of the forensic imaging, any of the

22  actual forensic work involved in this case?

23  A.   No.

24  Q.   By the time you got involved in this case, you were

25  handed something that was done by somebody else and then you

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA63

─────United States v. Meek─────

Griffith - Redirect

12

1  began to review that material?

2  A.   That's correct.

3          MR. GOROKHOV:  Thank you.

4          THE COURT:  Just a couple of questions from the

5  Court.

6          Ma'am, were you present when Mr. Meek was arrested?

7          THE WITNESS:  No, I was not.

8          THE COURT:  Who was present at that point?

9          THE WITNESS:  There were other agents from the FBI

10  that conducted the arrest.

11         THE COURT:  It's alleged that when Mr. Meek was

12  arrested he said something to the effect of:  My life is over.

13         I'm paraphrasing, but if I'm incorrect, you can

14  correct me on that.

15         Have you had any conversations with anyone regarding

16  that?

17         THE WITNESS:  No, I haven't.

18         THE COURT:  Any questions as a result of the Court's

19  questions?

20         MS. BEDELL:  One quick question, Your Honor.

21                   REDIRECT EXAMINATION

22  BY MS. BEDELL:

23  Q.   Special Agent Griffith, the comment about the life being

24  over.  Was that made at the time of arrest?

25  A.   My understanding is that it was made during -- at the

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA64

─────United States v. Meek─────

13

1   interview during the search warrant.

2           THE COURT:  Okay.

3           MS. BEDELL:  That's all, Your Honor.

4           THE COURT:  Thank you.  You may step down, ma'am.

5           Any other witnesses?

6           MS. BEDELL:  No, Your Honor.

7           (Witness excused.)

8           THE COURT:  Mr. Gorokhov, any witnesses?

9           MR. GOROKHOV:  No witnesses, Your Honor.

10          THE COURT:  Offer of evidence the way that we'll

11  handle this is -- the government being the proponent of the

12  motion, I'm going to allow you to go first.  Take as long as

13  you want.  Mr. Gorokhov, you can respond and I'll let you have

14  your rebuttal.  And you know me, I'm going to ask questions as

15  we go so be prepared.

16          MS. BEDELL:  I'm happy to direct my argument where

17  you find most useful.

18          Your Honor, obviously, you have read the affidavit

19  and you are familiar -- both that this is a presumption

20  offense and that we have offered significant evidence

21  detailing very serious harm to the community here.

22          So obviously, the trafficking conduct is extensive

23  and extends beyond the one count of transportation of child

24  pornography, but also goes beyond that to engaging with minors

25  online and inducing --

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA65

─────United States v. Meek─────

14

1      THE COURT:  We can all agree that the allegations

2   are very serious and I think Mr. Gorokhov will even agree that

3   this is a presumption case, presumption of no bond.  But the

4   concern is, as I articulated earlier, apparently there is at

5   least, from what I can tell, seven, eight, ten months between

6   the time that Mr. Meek was directly implicated in the wrong

7   that the government alleges and where we are today.  And from

8   what I've been made to understand, and please correct me if

9   I'm wrong, there's been no suggestion that he's tried to flee,

10  that he's been available, people have known where he is,

11  apparently he is living with his mother, and apparently he has

12  divorced himself from society to great degree and is basically

13  not doing very much at all.

14      So what has changed between April and now other than

15  the fact that he was formally arrested?

16      MS. BEDELL:  Well, I think that fact is significant,

17  Your Honor.  I would say that our focus in this argument is on

18  danger to the community rather than as much on his concern

19  about fleeing.  But to address the delay, if you will, as you

20  can tell from the affidavit there were, obviously, numerous

21  devices seized at the execution of the search warrant and

22  there's a large volume of data involved in reviewing the

23  content of those devices.

24      So, for example, we referenced the 2 Terabyte Hard

25  Drive which is just a tremendous amount of data right there.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA66

─────United States v. Meek─────

15

1  It was filled primarily with pictures and images and backed up

2  data.  So that alone was a significant undertaking to go

3  through and understand what evidence was there and we had

4  several devices like that.

5       THE COURT:  While this case isn't a sentencing case

6  in which we look at 3553(a) factors and all of that and

7  compare sentences received by one person with the sentence

8  that is proposed.  And in another case, Mr. Gorokhov is taking

9  the analytical perspective to another level saying that there

10  are people who are similarly situated, every case is

11  different, who had been allowed to remain out on bond pending

12  their actual disposition.

13       What would you say in response to that?

14       MS. BEDELL:  There are also a significant number of

15  cases where people who are similarly situated have been

16  detained.  For example, Judge Nachmanoff just detained someone

17  on a revocation or, excuse me, on a motion to revoke, an

18  order approximately a year ago, in a similar situation

19  involving online exploitation.  Now, all of these cases have

20  distinguishable factors, that is why it is an individualized

21  assessment, but courts in this district do regularly detain

22  individuals for the trafficking offenses, but we have here is,

23  frankly, more than the trafficking offense.  It is the online

24  exploitation of children which is a real harm to the

25  community.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA67

─────United States v. Meek─────

16

1        THE COURT:  Mr. Gorokhov has also made reference to

2   his client's standing in the community and I think we can all

3   admire what he has done as far as making sure that our

4   government is transparent, that things that happen are fully

5   divulged, particularly to loved ones, who are impacted

6   directly by the government's involvement in these kinds of

7   things.  And Mr. Gorokhov has suggested that that is something

8   that we should consider, not necessarily the things that is

9   going to decide the case, Mr. Meek's standing in the

10  community, which I think is a good standing for what he has

11  done and has proven to be done.

12       What would be your response to that, ma'am?

13       MS. BEDELL:  Certainly, that is a relevant

14  consideration of the nature and circumstances of the offense

15  and the defendant.  But we will say that the affidavit details

16  conduct going back to at least 2014, Your Honor.  So he

17  engaged in all of that admirable conduct, he won those awards,

18  he was an investigative journalist, he parented his children

19  while he was engaging in this criminal conduct that's detailed

20  in the complaint.

21       So it's clear that while it may be commendable, it

22  just doesn't have an effect on his engagement in criminal

23  activity, and he's proven himself adept at carrying on both

24  facets of his life at the same time and also concealing that

25  from the people around him, which raises concerns about a

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA68

─────United States v. Meek─────

17

1   third-party custodian regardless of how well-intentioned they

2   may be, their ability to supervise that kind of conduct,

3   because he's been engaging in this as he's carried on that

4   life.

5         THE COURT:  Interestingly enough, and Mr. Gorokhov

6   gets credit for this, Mr. Gorokhov has provided letters of

7   reference from people in law enforcement, which I'm sure you

8   can understand may actually carry a little bit more weight

9   when a person in law enforcement sort of steps up for an

10  individual saying that, I believe that this person is

11  deserving of maintaining his freedom.

12        MS. BEDELL:  Well, if that person were here, Your

13  Honor, I'd wonder if they would have said I understood that he

14  was engaged in that conduct before these allegations became

15  public.

16        THE COURT:  I think that's fair.  All of the letters

17  say I don't really know what's really going on here.  One of

18  the letters say, I hear it involves child pornography and

19  that's very serious.  The person was very, very, shall we say,

20  insightful as to the standard we need to take a look at, but,

21  again, they were willing to put their name out there for him.

22        MS. BEDELL:  And it is wonderful for the defendant

23  that he is in a position where he is able to muster that

24  support and certainly not all the defendants are, but I just

25  don't think it reflects on the danger that he poses because

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA69

─────United States v. Meek─────

18

1  these individuals, you know, if this were a character witness

2  that was testifying, the thing you would draw out is you

3  didn't know he was engaged in this behavior in the first

4  place, you don't live with him, you're not observing him on a

5  day-to-day basis, you just don't necessarily know what's going

6  on in someone's life when there's conduct that they're trying

7  to conceal.

8          THE COURT:  Okay.  I'll let you follow-up after

9  Mr. Gorokhov.

10         MS. BEDELL:  Thank you, Your Honor.

11         THE COURT:  Mr. Gorokhov.  You've gone a good job

12 presenting the best case you can for your client, but as you

13 understand this is a presumption case and the statutes that we

14 look at basically say it's a super-presumption case.  It can

15 be rebutted, but there is to be a real strong case to be made

16 to rebut this kind of situation.  Again, I think your biggest

17 hurdle to overcome is that the government's allegations

18 suggest grooming, and we all know what that term means.  And

19 that is a big concern to the Court and that not only is this

20 individual alleged to have been engaged in the use and

21 solicitation of child pornography, but arguably, if this is

22 indeed true, is taking it a step further by actually having

23 contact with minors.

24         What would be your response?

25         MR. GOROKHOV:  Yes, Your Honor.  So first of all, I

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA70

─────────United States v. Meek─────────

19

1  think it is important to address the standard here, which what

2  presumption means and what presumption doesn't mean.  And I

3  think that frequently gets lost and misinterpreted so which is

4  why we had filed, prior to the last detention hearing, we

5  filed an actual memorandum.  What the presumption standard

6  says is that Mr. Meek does have a burden, a burden of

7  production which Courts have repeatedly said is a very low

8  burden, a very low burden, a limited burden.

9         If he comes forward to show that there are, based on

10  his background, characteristics, et cetera, conditions of

11  release that are likely, not guaranteed, merely likely to

12  ensure that he's not a danger to the community, the

13  presumption then shifts back to the government and we're back

14  in the world of any normal bail case.

15         And what I submit, Your Honor --

16         THE COURT:  If that's indeed the case if the

17  analysis was that simple, why did Congress come up with this

18  term, "presumption" and take it a step further and talk about

19  the strong presumption?

20         MR. GOROKHOV:  Your Honor, it's never -- I mean I

21  have the memorandum here and I can quote from it.  It is filed

22  on the docket.

23         THE COURT:  Sure.

24         MR. GOROKHOV:  But the courts have repeatedly said

25  it's limited to a burden of production.  I think Congress,

─────────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────────

EASTERN DISTRICT OF VIRGINIA

JA71

United States v. Meek

20

1  Your Honor, in creating the scheme understood the liberty

2  stakes that are at interest, the important liberty stakes that

3  are at interest for an individual who's been merely accused by

4  the government.  And I do want to talk about the weight of the

5  evidence because I think that's a big problem here for the

6  government.

7        But an individual who's been merely accused, who on

8  the basis of a complaint affidavit signed by an agent, who

9  only had recent participation in the investigation, now he has

10 to be locked up.  That's why Congress placed a very limited

11 burden on defendants, even in presumption cases, merely to

12 come forward with the burden of production to show --

13       THE COURT:  And I agree with you because there has

14 to be some consideration of the concept of innocent until

15 proven guilty beyond a reasonable doubt.  So there needs to be

16 a reasonable balance in that, so I get that.

17       MR. GOROKHOV:  And I think what Mr. Meek has come

18 forward with, Your Honor, meets not merely a burden of

19 production, but I would submit to Your Honor an overwhelming

20 burden that Mr. Meek will follow the conditions of release

21 that he will do what he is told.

22       THE COURT:  Let me ask a general question.  If you

23 don't want to answer it, I appreciate it.  The agent testified

24 with regard to certain devices that were seized and certain

25 forensic analysis that was done, and again you don't have to

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

JA72

—United States v. Meek—

21

1   answer this if you don't want to.  Is there anything that you

2   believe as part of your theory of defense that these items

3   were not his?

4          MR. GOROKHOV:  Your Honor, to be honest with you

5   this is a unique situation.  I might want to answer that

6   question if I could.  But I have not received a shred of

7   discovery.  And that's another -- that's, I think that's

8   another one of those major weighty issues, because we're

9   supposedly, in this adversarial world, where, you know,

10  government doesn't just get to make accusations and we sit

11  here with our hands tied behind our back and blindfolded.  But

12  that's, in effect, what's happening.  They've put on an agent,

13  even here today, who had participation in only a small

14  fraction of the investigation and everything she's reviewed

15  was handed to her by someone else who obtained the evidence,

16  imaged the evidence.  And as Your Honor knows, we've been

17  through this before.  The devil is in the details when it

18  comes to these forensic reviews.

19         So quite simply, Your Honor, I'm sitting here with

20  like my hands tied behind my back as to the allegations.  What

21  I will say, regarding Your Honor's question on grooming, is

22  that the government can't speak out of both sides of its mouth

23  here.  On the one hand, it says the conduct goes to 2014, on

24  the other hand, they come forward with zero evidence and not

25  even an allegation that Mr. Meek ever attempted to meet a

—Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA

JA73

United States v. Meek

22

1  child, tried to meet a child, you know, had improper physical

2  contact with a child.  Grooming, generally, refers to kind of

3  priming a child so that you can then go and have contact with

4  that child.

5         THE COURT:  Unfortunately, both you and I and the

6  representatives of the government have a lot of experience in

7  these kinds of cases and I think we all understand that in

8  these kinds of cases there's a continuum that we tend to see.

9  It starts out with a little something, then it sort of evolves

10 into something else, and then there's a grooming, which from

11 what I understand and the science, can take a period of time,

12 and then you get the meeting, and then you get the act.  So

13 it's a process.  I'm not suggesting that your client did this,

14 but his -- the allegations against him suggest that continuum.

15        MR. GOROKHOV:  Well, Your Honor, but then again if

16 he -- if they say the conduct goes back to 2014 and have

17 absolutely zero evidence and not even an allegation that he

18 tried to meet a child, I think that -- I think the conclusion

19 there is -- it was never his intention to meet a child.

20 Assuming -- I'm saying these are allegations, Your Honor.

21        THE COURT:  Yes.

22        MR. GOROKHOV:  But I think the fair conclusion there

23 is not that he was preparing after nine years to finally go

24 meet a child.  I think the conclusion is that that was never

25 his intention, you know, that was never his intention.  And I

JA74

United States v. Meek

23

1  think we have to give a defendant some benefit of the doubt.

2  He can't -- you know, he can't be that the government comes

3  here and puts forward a theory and, you know, and he's

4  helpless to defend against that.

5          THE COURT:  But what I'm assuming Ms. Badell is

6  going to come back with is that because of the nature of this

7  kind of offense that one could argue, again, looking at

8  allegations here, that Mr. Meek, according to the government,

9  was starting to begin the process of acting on his fantasies.

10          MR. GOROKHOV:  Again, Your Honor, I think that's a

11  theory.  I think even beyond, you know, accusations that

12  aren't even returned by a grand jury but signed by an agent

13  with limited knowledge of an investigation, to pile on top of

14  that a theory is, you know, a step much too far when you have

15  an individual like Mr. Meek.  And I want to address the

16  evidence about his life and the way he's lived his life.  But

17  to come here and spin out a theory about something he might

18  have done, I would say, Your Honor, even beyond --

19          THE COURT:  And another question that I'm going to

20  ask Ms. Bedell when she gets back up is if this case was as

21  sensitive and, I think, developed as is being suggested by the

22  government, why did it take so long to even go to the grand

23  jury to seek an indictment?  That's a question that I would

24  have, but, again, we'll hear.

25          MR. GOROKHOV:  Yes, Your Honor.

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

JA75

─────United States v. Meek─────

24

1       THE COURT:  Let's hear about your client.

2       MR. GOROKHOV:  Yes, I do want to address the

3 situation with my client.  You know, in terms of his

4 background, I have tried to be as both complete and concise as

5 I could, so I'm not going to stand here and repeat everything

6 that I know Your Honor has reviewed in detail.  What I will

7 say is I think it's extraordinary that Mr. Meek has an

8 individual like Spike Bowman, you know, a person who was the

9 head of the National Security Law Unit of the FBI and spent

10 his life working in national intelligence and law enforcement.

11 And he knows the allegations against Mr. Meek and he's putting

12 his name forward saying that Mr. Meek will keep his word.

13       An individual like Raymond Gannon, 28 years in the

14 FBI, Your Honor.  An individual like Douglas Kimmy, 27 years a

15 police officer and a former member of the U.S. military.

16 These things should not be taken lightly and I know the Court

17 doesn't take them lightly.  And so, when we say "similarly

18 situated defendants," I know the government referred to an

19 individual that had Judge Nachmanoff had considered, I don't

20 think there's really a comparable individual.  I would go so

21 far as to say that.

22       In terms of kind of his record of good works in the

23 community and the people that are willing to stand behind him

24 in the community knowing what they know about the allegations

25 in this case.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

JA76

─────United States v. Meek─────

25

1          The government says --

2          THE COURT:  I think we can all agree the things that

3     Mr. Meek has done are heroic, no doubt about it.  But even

4     heroic people can lose their way, and that's, I believe, what

5     the government is suggesting here.

6          MR. GOROKHOV:  I understand that.  But what the Bail

7     Reform Act says is we're at a stage where we haven't heard any

8     evidence, all we have are accusations.  Right.  And in these

9     circumstances, the reason why we considered the background

10    history and, you know, community ties and all of those things

11    is because the Court has to make a determination based on how

12    much faith they can place on an individual.  And so, the Bail

13    Reform Act tells us these things matter.  These things matter

14    a lot, because the accusations haven't been proven yet but

15    this man's track record, to some degree, proven by among other

16    people, someone like Spike Bowman who is standing by his side.

17          And I would like to say the government says well all

18    of that is good and well but Mr. Meek was doing these heroic

19    acts and has the support of all these people, but at the same

20    time he was committing horrible crimes.  Well, if that

21    argument held any water, Your Honor, if that argument held any

22    water, then it would invalidate an entire section of the Bail

23    Reform Act because every individual who comes before the

24    Court, the Court has to consider their background, history,

25    and characteristics.  And if the government's argument were

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA77

─────United States v. Meek─────

26

1  true, the Court could simply say, yeah, but he was doing

2  crimes so I'm not going to consider those things.  So their

3  argument absolutely makes no sense.  It's illogical and it's

4  completely contrary to the way that Congress intended this to

5  work.

6         THE COURT:  I had an opportunity to review the

7  hearing before Judge Vaala, and I actually talked with Judge

8  Vaala to find out what was going on in the case because I

9  needed to prepare quickly.

10        MR. GOROKHOV:  Yes, Your Honor.

11        THE COURT:  And in the, I think, the hearing itself

12 she said something to the effect of "it's a close case."  I

13 think those were the terms that she used.  If indeed it was a

14 close case, analytically, doesn't that sort of argue against

15 your position?

16        MR. GOROKHOV:  No, Your Honor.  I think the question

17 is there's -- it's either a yes or no question.  Either there

18 are conditions of release, in which case release is not

19 discretionary, it's mandatory, or there simply aren't

20 conditions of release.  And what Judge Vaala said is, Yeah, to

21 me it's a close case, but I think there are conditions of

22 release, and at that point the Bail Reform Act says release at

23 that point is mandatory.  The conditions are discretionary.

24 So the extent of supervision and all of that.  But once that

25 threshold is crossed that there are conditions that would

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA78

United States v. Meek

27

1    reasonably assure.  And I think it's important here, Your

2    Honor.  The government kind of pretends that, you know, there

3    has to be a guarantee.  And while I submit to Your Honor

4    letters in support from individuals like the ones he has are

5    as close to a guarantee as the Court can get.  The cases say

6    otherwise.  The cases say there just has to be a reasonable

7    assurance that the conditions of release.  There's no

8    guarantees in life and there's no guarantees under the Bail

9    Reform Act.  And the courts recognized that it has to be

10   merely a reasonable assurance that he's going to appear.

11          And I do want to talk, Your Honor, about the

12   evidence, the overwhelming evidence that he's going to appear.

13   And that he's not going to violate the conditions of release.

14   But before I do, I wanted to say also that Your Honor referred

15   to these comparator cases that we cited, and what I want to be

16   clear is these cases are not similar to Mr. Meek's, these

17   cases are worse than Mr. Meek's, because in these cases

18   individuals either had sexual contact with minors, without

19   question, or they were on their way, they were doing the thing

20   that the government is theorizing that maybe Mr. Meek one day

21   might have gotten around to doing.

22          In those cases, these individuals were either

23   sexually engaging with minors hands on or on their way to do

24   so, and they were stopped by law enforcement.  And yet, judges

25   in this court have repeatedly said, well, you know, I look at

JA79

——United States v. Meek——

28

1   the background and history and characteristics and I find that

2   release is appropriate.  So I would say, Your Honor, that,

3   given his background and given that his crime is certainly not

4   as serious as the ones we talked about, certainly there can be

5   conditions of release.

6        I wanted to address the government's other argument,

7   which is -- I know Your Honor wants to know about Mr. Meek's

8   statement about supposedly his life being over.  And I think

9   this one is really an argument that I really didn't expect the

10  government to repeat because --

11       THE COURT:  I think the reason why they're

12  suggesting that is because one of the inquiries that the Court

13  must make is whether or not he's a danger to himself.

14       MR. GOROKHOV:  Yes, Your Honor.  And here the

15  evidence, again, is overwhelmingly in favor of Mr. Meek that

16  he's not a danger to himself.  In April, Mr. Meek's apartment

17  was searched and Mr. Meek realizing that his apartment was

18  being raided by armed federal agents made, I would argue, the

19  accurate observation that his life was, in a sense, over.

20  Because he was in a high power -- a high profile investigative

21  journalist, and when you're in his position and this kind of

22  thing happens, your professional life is certainly over.  And

23  what has Mr. Meek done -- so it's a true statement.  And you

24  know it's a statement of an individual whose head is very much

25  in the realm of reality, right.  And what has he done since

——Tonia M. Harris OCR-USDC/EDVA 703-646-1438——

EASTERN DISTRICT OF VIRGINIA

JA80

───────United States v. Meek───────

29

1　the nine months since his apartment was raided?  You know the

2　government talks about the fact that he left his job and moved

3　out of his apartment.  Well, he left his job because he didn't

4　want to continue working as an investigative journalist at ABC

5　News while he was under federal investigation.

6　　　　　THE COURT:  That makes sense.  I buy into what

7　you're saying and plus he did something, which I thought was

8　somewhat redemptive in that apparently he was up for an award

9　with another person and did not want to embarrass that person

10　by showing up when he was under federal investigation.  That

11　shows something.

12　　　　　MR. GOROKHOV:  And he moved in with his mother

13　because he wasn't going to have an income, right.  That's a

14　responsible, conscientious thing to do.  He notified the

15　government that he was moving in with his mother.  He offered

16　to give the government his passport.  The government didn't

17　accept his offer.  He, you know, all the time I repeatedly

18　told the government if there's anything you need to know about

19　Mr. Meek, where he is, what he's doing, or anything like that,

20　please tell us because we want this to be, you know -- we want

21　there to be no surprises, we want to be --

22　　　　　THE COURT:  Transparent.

23　　　　　MR. GOROKHOV:  He relinquished his firearms and put

24　them in a storage unit where only his mom and another

25　individual have access.  He does not have access.

───────Tonia M. Harris OCR-USDC/EDVA 703-646-1438───────

EASTERN DISTRICT OF VIRGINIA

─────United States v. Meek─────

30

1    He's done all of these things, Your Honor, and I
2    would say these are the things that a person who is
3    responsible and conscientious does.  And there's overwhelming
4    evidence that he's going to take orders imposed by this Court
5    very, very seriously.

6    And you know, Your Honor, I would go so far as to
7    say that if it's not Mr. Meek who is released, you know, what
8    kind of a message does that send.  We want people to be
9    cooperative.  We want people to behave exactly the way
10   Mr. Meek behaved after he realized that he was being looked at
11   by the government.

12   And so, I would say, Your Honor, for the government
13   to come up here and twist his actions and his statements into
14   like him being some kind of a danger to himself, I think that
15   kind of hurts more than just Mr. Meek.

16   The final thing I will say, Your Honor, is the
17   government says that, you know, because the nature of his
18   alleged defenses are computer offense, computer-based offenses
19   we can't monitor what he's doing.  And that is a -- again,
20   another extraordinary argument they've brought, because it
21   would --

22   THE COURT:  I have something in common.  The Fourth
23   Circuit had a question for me when they remanded a case that
24   we did.  I was correct on most of it and they remanded a case
25   to me because they wanted me to explain why I would prevent a

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA82

─────United States v. Meek─────

31

1  person convicted of child pornography not to have access to

2  adult pornography and video games, which I found a little bit

3  perplexing, but, again, that's the way they look at it.  So

4  it's actually to your advantage.

5          MR. GOROKHOV:  And I think for the government to

6  come here and say you can't monitor people who commit crimes

7  online is to write an entire category of people out of the

8  Bail Reform Act.  It's inconsistent with the recommendations

9  of pretrial office -- the pretrial office, which says there

10  are conditions that can be imposed.

11          THE COURT:  Answer this for me, Mr. Gorokhov.

12  Again, I'm not suggesting that your client will do this.

13  We're talking from a hypothetical standpoint.

14          MR. GOROKHOV:  Yeah.

15          THE COURT:  Suppose there's an order in which I

16  preclude him from having access to the internet and you agree

17  to that and I preclude him from having access to adult

18  pornography and you agree to that, the government and the

19  probation office are going to focus on what is in his home,

20  what he actually has direct access to.

21          What is to prevent someone from giving him something

22  that he could access through another means that he does not

23  have any real connection to?  Where is the check and balance?

24  A probation officer can't be with him 24/7.  It can only do

25  random checks.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA83

United States v. Meek

32

1    MR. GOROKHOV:  Well, I think, again, the first if we

2  were just talking about a general person and not Mr. Meek,

3  just, you know, your average defendant, right, I think the

4  answer there would be the law requires reasonable assurance

5  and the pretrial services office believes they can provide

6  reasonable assurance through the measures that they talk about

7  in their report.  Right.

8    Now, we add Mr. Meek into the mix and we add the

9  fact that the way he's conducted himself over the last nine

10 months, we add the fact that the people who know him

11 intimately, not just any old regular people, but law

12 enforcement people, are willing to vouch for him, you add all

13 of that into the mix and basically what it comes down to is

14 that Mr. Meek will keep his word.  And Congress, as I've said

15 before, Your Honor, Congress does not require an absolute

16 100 percent guarantee.  Congress requires a reasonable

17 assurance.

18    THE COURT:  But there at least appears to be some

19 tension between the Bail Reform Act and the standard for this

20 kind of case and the presumption of no bond.

21    Where is the sweet spot?

22    MR. GOROKHOV:  I think the sweet spot is if the

23 defendant can come forward with a low burden, burden of

24 production, now it's back to the government like any old case.

25 And again, Mr. Meek has come forward not just with a burden of

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

JA84

─────United States v. Meek─────
33

1   production, Your Honor, but I would say overwhelming evidence.

2   Nine months of evidence at least, arguably 30 years of

3   evidence that he is a man of his word and he will do exactly

4   what this Court tells him to do.  And he will abide by these

5   conditions of release to the letter and he knows the

6   consequences, Your Honor, if he does not.  He's living those

7   consequences right now in a cell where he's by himself 24

8   hours a day.

9           THE COURT:  Ms. Bedell, you get the last word,

10  ma'am.

11          MS. BEDELL:  Your Honor, just to address a small

12  point first and then respond more directly to some of the

13  questions and points that were raised.  So just to the point

14  about discovery, on February 2nd I did inform Mr. Gorokhov

15  that the FBI had evidence available for the defendant's review

16  and we were happy to facilitate that.  Understandably, he did

17  not take the limited time between now and then, but it was

18  made available, and, frankly, it just does not go to the

19  weight of the evidence.  The fact that his cross-examination

20  has been limited to questions about when we learned certain

21  information, again, demonstrates that very strong evidence

22  here.

23          I also want to address, I think, put a little bit of

24  a misperception that seems to be coloring some of the

25  discussion here and that the only harm to children is through

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

JA85

─────United States v. Meek─────

34

1  physical contact, and also relatedly that grooming is only

2  leading up to physical contact.

3          Now, it is correct that we do not have allegations

4  in the complaint that relate to meeting up with a child in

5  person, and to me that is not relevant.

6          THE COURT:  And I appreciate the fact that because

7  of this type of litigation and because of the statutory

8  framework that Congress came up with that it is clear that the

9  grooming is one aspect of it.  The fact that you victimized

10  children by subjecting them to being part of the internet

11  interplay between people of similar desires is the greater

12  concern in this kind of case, so I get that.

13          MS. BEDELL:  Thank you, Your Honor.  And there's the

14  trafficking harm, which in some ways, you know, I think we

15  quoted, is a repetition of the abuse.  But the fact is that

16  online exploitation, what we've seen Mr. Meek engaging in,

17  he's the original abuser there.  He is an original victimizer.

18  It is not just if he had met up with someone in person.  So it

19  sounds like you understand that.  I appreciate that, Your

20  Honor.

21          I also wanted to address something you mentioned at

22  the very beginning that you said we hadn't seen any

23  problematic behavior from him since April.  I would agree

24  that's accurate regarding risk of flight, but we can't make

25  that statement when we talk about what he's doing online.  The

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA86

────United States v. Meek────

35

1  fact is that we don't know what he's been doing online since

2  that time.  So I don't think we can say that just because we

3  haven't caught him doing something in the last period doesn't

4  mean he's not a continuing harm to the community even in the

5  intervening nine months or whatever the period is.

6         To answer your question about why it has taken so

7  long, I was addressing the point about the voluminous data,

8  and understandably we have to understand what the evidence is

9  and just because you even get into the phones, some of these

10  phones were password protected.  Just because you get in, it

11  doesn't mean the evidence immediately reveals itself.

12         The other part is that, of course, you're familiar

13  with the timelines in this district.  And so, we have a

14  careful line that we have to strike between charging a

15  defendant and making sure we still have the opportunity we --

16  we need to complete our investigation.

17         To the point about an affidavit versus a complaint,

18  cases in this district are regularly charged by affidavit.

19  They provide ample evidence for the Court to review more so

20  than what might be available if something had come before this

21  Court for a detention hearing in an indictment posture.  And

22  so, I do think that is ample evidence and also certainly not

23  outside the realm of normal practice.

24         I wanted to address the argument that our approach

25  would invalidate the Bail Reform Act.  And I just, obviously,

────Tonia M. Harris OCR-USDC/EDVA 703-646-1438────

EASTERN DISTRICT OF VIRGINIA

JA87

─────United States v. Meek─────

36

1  don't agree with that.  I think the inquiry here is the

2  balancing inquiry, and, you know, just saying that electronic

3  monitoring is sufficient would invalidate in the other

4  direction.  There will always be some condition that could

5  satisfy if electronic monitoring suffices.

6          So the question here is whether the available

7  conditions are appropriately balanced against the risk of

8  harm.  And again, we have a situation here where we have an

9  original abuser.  He is engaged in that original harm.  And

10  so, I submit, as we've been arguing, and I won't reiterate all

11  of those points, but that is not satisfied in this specific

12  instance.

13          And I believe those are all the points I would like

14  to make unless you have additional questions that you would

15  like to address.

16          THE COURT:  No, ma'am.

17          MS. BEDELL:  Thank you, Your Honor.

18          (A pause in the proceedings.)

19          THE COURT:  I'm going to state the applicable law

20  and the analytical perspective that the Court is going to

21  provide to justify the conclusion that's reached here.

22          A government appeal of a magistrate's release order

23  is governed by 18 U.S.C. 3145(a).  The review of the

24  magistrate's decision is *de novo* as we have conducted here

25  under the *United States v. Stewart* case, a 2001 case out of

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA88

───────United States v. Meek───────

37

1    the Fourth Circuit.

2         In this regard, the Court makes an independent

3    determination of a proper pretrial detention or conditions of

4    release.

5         To determine that a person should be detained

6    pending trial, a Court must find "no condition or combination

7    of conditions will reasonably assure the appearance of the

8    person as required and the safety of any other person and the

9    community."

10        If there's probable cause to find that the defendant

11   committed an offense involving a minor, a rebuttal presumption

12   arises that no condition or combination of conditions will

13   reasonably assure the safety of other persons and the

14   community.  That is governed by 18 U.S.C. Section

15   3142(e)(3)(E).

16        In such a case, a defendant bears the burden of

17   production to come forward with evidence to suggest that the

18   presumption is unwarranted in his or her particular case.  If

19   the defendant successfully rebuts the presumption, the burden

20   returns to the government under the *Boyd* case out of this

21   district in 2007.

22        Even if the defendant bears his burden, the

23   presumption remains a fact in deciding whether to detain a

24   defendant because it reflects Congress's substantive judgment

25   that particular classes of offenders should be detained prior

───Tonia M. Harris OCR-USDC/EDVA 703-646-1438───

EASTERN DISTRICT OF VIRGINIA

JA89

—————United States v. Meek—————

38

1   to trial.  That was articulated in *United States v. King* and

2   several other cases in sister jurisdictions of this court.

3       If the burden returns to the government, they bear

4   different burdens with respect to the dangerousness and risk

5   of flight.  The government must prove by clear and convincing

6   evidence that no condition or combination of conditions will

7   reasonably assure the safety of any other persons and the

8   defendant.

9       The Court takes a look at under 3142(g) the nature

10  and circumstances of the offense, including whether the

11  offense involves a minor victim, the weight of the evidence

12  against the person, the history and characteristics of the

13  person, including the person's character, physical and mental

14  condition, family ties, employment, financial resources,

15  length of residence in the community, community ties, past

16  conduct, history relating to drug or alcohol abuse, criminal

17  history, and records concerning appearances at court

18  proceedings.

19      The nature and seriousness of the danger to any

20  person to the community that would be posed by the person's

21  release is tantamount under 3142(g)(4).

22      In the hearing before Judge Vaala, defense counsel

23  identified four cases where the magistrate released a

24  defendant charged with an offense involving a minor.  In the

25  *United States v. Delgado*, which is distinguishable, there was

─────United States v. Meek─────

39

1  a single victim who knew the defendant.  The primary

2  consideration in that case was the safety of the single minor

3  who the defendant was barred from contacting.  That is not the

4  case here with multiple victims spread out across the United

5  States and potentially beyond.

6         The *United States v. Moser* case, which is cited, the

7  defendant in that case occurred in 2008 when the state of the

8  internet was much different.  Instagram, SnapChat, and Omegle,

9  which the defendant purportedly or allegedly used to contact

10  his victims, were not even created at that time.

11         *United States v. Sims*, there's some also

12  distinguishing characteristics.  There was no evidence of

13  actual communication between the defendant and the minor

14  victims at the time, only communication with an undercover

15  agent.  The defendant and Sims did not pose to be someone

16  else.  Apparently and allegedly this defendant has apparently

17  impersonated teenage girls and engaging in grooming activity.

18         Also, the defendant and Sims only used one messaging

19  service to contact minors indicating a relatively

20  unsophisticated method of contacting minors.  That is

21  juxtaposed with the instant case where the defendant has

22  allegedly used multiple avenues to contact minors, including a

23  level of sophistication as not of the same as in Sims.

24         And finally, the *United States v. Cheves*, the

25  distinguishing characteristics on possibly two victims who

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA91

United States v. Meek

40

1  lived outside of the United States and the chief concern there

2  was for the safety of the -- of the victims in that case.  And

3  there was no indication that China was going to be an avenue

4  or venue where it could be implicated in the defendant's

5  conduct.

6           Ultimately, in deciding this case the Court looks at

7  the following factors:

8           Obviously, the Court has the authority to revoke the

9  order of release, and there's a rebuttable presumption of

10  detention that exists.  The egregious nature of the alleged

11  offense, the ample evidence in this case at this point, the

12  defendant's lengthy pattern of engaging in conduct and the

13  danger he poses to the community weigh strongly in favor of

14  detention.

15           Nature and circumstances suggest that the defendant

16  is currently charged with transportation of child pornography.

17  The affidavit reveals that his offense conduct is much more

18  extensive.  The transportation events itself involves the

19  distribution and receipt of child pornography with individuals

20  that the defendant apparently sought out online for the

21  purpose of discussing violent sexual fantasies about child

22  abuse and exchanging information.

23           The defendant was at least a member of one community

24  dedicated to the exchange of this information and it is

25  alleged that he actively contributed to the group.  Even more

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

JA92

United States v. Meek

41

1 concerning, the defendant has a history and pattern of

2 allegedly engaging in and trying to engage in sexual conduct

3 and conversation with minors online. For example, a minor

4 victim told law enforcement that the defendant pressured her

5 to send pictures depicting sexual explicit conduct. Law

6 enforcement is alleged to have found 11 images of this minor

7 on the defendant's phone, including nude images with her

8 breasts and pubic region exposed.

9         Law enforcement also located the chat, allegedly,

10 between the defendant and the minor in which he manipulated

11 her by offering access to the public figure he knew she,

12 quote, loved most in the world.

13         In other instances, the defendant concealed his

14 identity allegedly while he engaged in these online exploits

15 with minors. Allegedly, he even posed as an adolescent girl

16 using that person to engage in sexual conversations with other

17 young girls.

18         The defendant's interests are broad. The evidence

19 reveals, allegedly, a man interested in trading images

20 depicting everything from the rape of infants to the bondage

21 of S&M treatment of prepubescent boys, to the sexual

22 exploitation of late adolescents.

23         The government alleges that his conduct spans

24 multiple platforms and years. His devices, allegedly,

25 contained conversation with minors on SnapChat, Instagram, and

─────United States v. Meek─────

42

1  other devices.

2      Of course, the defendant does not just view

3  the information, allegedly distributed.  As courts have

4  regularly recognized "such images are permanent records of the

5  child's participation and the harm to the child is exacerbated

6  by the circulation.  *United States v. Burgess* recognize that

7  Fourth Circuit case in 2012.

8      These children who "must live with the knowledge

9  that adults like the defendant can pull out a picture or watch

10  a video that has recorded the abuse of them at any time,

11  suffer direct and primary emotional harm when another person

12  possesses, receives or distributes the material."

13      The weight of the evidence, as it is at this stage,

14  is compelling.  The messages and images were located and on

15  devices throughout the defendant's home where he lived alone.

16  At this point, the devices contained numerous indications that

17  they belonged to him, including his personal accounts and

18  data.  They had been used to engage in illegal activities in

19  close proximity when he had used them for other business and

20  personal affairs.

21      As Judge Vaala stated, this case is difficult.  It

22  is compelling because this man has done a lot of things which

23  have contributed significantly to the public good.  He has

24  done a lot of great things, allowing families to get closure

25  on, things that were very important to them in their lives,

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

JA94

───United States v. Meek───

43

1    but this has to be considered in balance, more particularly,

2    with the nature of the offense and the circumstances which the

3    government alleges to have been able -- alleges they are able

4    to prove in the context of this case.

5            So the Court in this matter is going to order that

6    Mr. Meek remain detained.  All right.

7            Mr. Meek, I'll say this to you, sir, you have an

8    excellent lawyer.  Mr. Gorokhov's reputation with me is

9    outstanding.  We have done cases in the three years that I

10   have been here and he is an excellent advocate.  He works hard

11   for his clients.  So let me encourage you to work with him as

12   best you can to allow yourself to be put in the best position

13   that you can, sir.  I know you're disappointed, but I'm sure

14   you understand the analysis that the Court had to go through.

15           Anything else from the government?

16           MS. BEDELL:  No, Your Honor.  Thank you.

17           THE COURT:  All right.  Where are we as far as

18   getting this case ready for some sort of disposition?  Where

19   are we?

20           MS. BEDELL:  Your Honor, that's something we have

21   discussed with defense counsel.  I don't think we're in a

22   position to talk about a resolution at this point, but we

23   expect to be here hopefully in the next week or two.

24           THE COURT:  Okay.  I will tell you a concern about

25   this, I don't want this case to sort of just sit and wait.  I

───Tonia M. Harris OCR-USDC/EDVA 703-646-1438───

EASTERN DISTRICT OF VIRGINIA

JA95

──United States v. Meek──

44

1  want it to move.  Obviously, in making a determination that

2  Mr. Meek should be detained, it sort of ups the ante as far as

3  the government's obligation to move this case along.  So let's

4  do all that we can to make sure that we get this case on the

5  docket and expeditiously considered.

6          MS. BEDELL:  Absolutely, Your Honor.  Thank you.

7          THE COURT:  Thank you.  We're done.

8

9          **(Proceedings adjourned at 12:57 p.m.)**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

──Tonia M. Harris OCR-USDC/EDVA 703-646-1438──

EASTERN DISTRICT OF VIRGINIA

JA96

────United States v. Meek────
45

1                    CERTIFICATE OF REPORTER

2

3           I, Tonia Harris, an Official Court Reporter for the

4    Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Final pretrial

7    conference the case of the **UNITED STATES OF AMERICA versus**

8    **JORDAN GORDON MEEK**, Criminal Action No.: 1:23-mj-32, in said

9    court on the 6th day of February, 2023.

10          I further certify that the foregoing 45 pages

11   constitute the official transcript of said proceedings.

12          In witness whereof, I have hereto subscribed my

13   name, this February 9, 2023.

14

15

16

17

18

19

20

21                         _____/s/_____
                           Tonia M. Harris, RPR
22                         Official Court Reporter

23

24

25

────Tonia M. Harris OCR-USDC/EDVA 703-646-1438────
EASTERN DISTRICT OF VIRGINIA

JA97

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Action No. 1:23-mj-32 (LRV/RDA) |
| | ) | |
| JAMES GORDON MEEK | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

This matter comes before the Court on the government's Motion to Revoke the Release
Order. Dkt. 26. Having considered the Motion (Dkt. 26), Defendant's Opposition (Dkt. 27), the
record before Magistrate Vaala, and the evidence and arguments presented at the February 6, 2023
hearing, and for the reasons stated on the record at the February 6, 2023 hearing, it is ORDERED
that the government's motion is GRANTED; and it is

FURTHER ORDERED that Magistrate Judge Vaala's Order Setting Conditions of Release
(Dkt. 16) is hereby revoked; and it is

FURTHER ORDERED that Defendant James Gordon Meek shall be detained pending
trial.

It is SO ORDERED.

Alexandria, Virginia
February, 6 2023

_____ /s/

Rossie D. Alston, Jr.
United States District Judge

JA98